In the Matter of the Application of the MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK Relative to Acquiring Title to Property Necessary for the Improvement of the Water Front on the North River.

THE CITY OF NEW YORK et al., Appellants; THE AMERICAN ICE COMPANY, Respondent.

1. DISTINCTION BETWEEN LEGISLATIVE BODIES AND GOVERNING BODIES OF MUNICIPALITIES. Practical considerations essentially differentiate national or state legislatures. from similarly constituted common councils of municipalities, the co-ordinate branches of which may meet at the same time or at different periods, and whose work is of such a character that it can neither be all initiated or finished at any particular time or place of meeting, or during the continuance of any particular membership.

2. COMMON COUNCIL OF CITY OF NEW YORK. The common council of the city of New York, at a time when it consisted of co-ordinate branches having concurrent powers, to one of which the members were elected for a term of two years and in the other for one year, did not

terminate with the change of membership, but was a continuous body, and could conclude business in one year which had its inception in a previous year.

3. GRANT OF PIER — EFFECT OF RESERVATION OF RIGHT TO FILL IN ADJACENT LANDS CONTAINED IN OTHER GRANTS. Where the city of New York had granted to the respondent's original predecessor in title a pier at the foot of Forty-third street, with the right of wharfage thereon, but had previously granted the adjacent lands under water with a reservation of the right to cause such lands to be filled in to a point beyond the outer end of the pier existing at the time it was granted, the grantee of such pier did not obtain, as an incident of his grant, an easement or right of access to and from the pier over the land under water adjacent thereto, which is usually incident to a grant to pier rights, but merely a privilege by sufferance and not a legal right.

4. SAME — GRANT OF PIER CONSTRUED. As the grant of the pier did not include the land underneath it, but contained provisions permitting it to be extended beyond its original outer line, the grantee and his successors in title obtained the right to maintain a pier at the "foot of Forty-third street * * * wherever that point should be located by lawful authority" (*Knickerbocker Ice Co.* v. *42nd St., & G. St. F. R. R. Co.*, 176 N. Y. 408) of which right it cannot be deprived in condemnation proceedings except upon due compensation.

*Matter of Mayor, etc., of New York,* 121 App. Div. 702, reversed.

(Argued June 8, 1908; decided December 8, 1908.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered November 16, 1907, which reversed an order of Special Term confirming the report of commissioners of estimate and assessment in the above-entitled proceeding.

This is a condemnation proceeding instituted by the city of New York for the purpose of acquiring title to certain lands, riparian rights, easements, etc., on the easterly shore of the North river in the territory which may be generally referred to as bounded on the south by Forty-second street, and on the north by Forty-third street. The parties to the proceeding are the city of New York, which is prosecuting in the exercise of its right of eminent domain, and the Forty-second Street and Grand Street Ferry Railroad Company and the American Ice Company, which are asserting rights for which they claim compensation. As between the city and the railroad company the contest involves practically nothing but the

question of compensation. Between the city and the railroad company, on the one hand, and the ice company and its predecessor in title and interest on the other, there have been controversies over a variety of questions. In this proceeding there have been two reports of the commissioners of appraisal. The first was confirmed by the order of the Special Term, which was reversed at the Appellate Division because the commissioners had made no determination upon the claims of the ice company. The proceeding was returned to the same commissioners, who repeated the award to the railroad company, with an addition for interest, and reported against the ice company upon the ground that it had no rights in the premises sought to be condemned. This second report was approved at Special Term. At the Appellate Division the order of confirmation was reversed by a divided court, upon the ground that this court had held, in *Knickerbocker Ice Co.* v. *Forty-second Street & Grand Street Ferry R. R. Company* (176 N. Y. 408), that the plaintiff in that case (the predecessor in interest of the claimant ice company in the proceeding at bar) was the owner of rights which entitle the American Ice Company to a substantial award. A second time the proceeding was directed to be returned to the commissioners with instructions to proceed in accordance with the expressed views of the majority of the justices of the Appellate Division. The prevailing opinion suggested, however, that the differing conclusions reached by that court rendered it proper to certify the matter to this court. The city and the railroad thereupon moved for leave to appeal to this court and that motion was granted. Thereupon the following question was framed and certified to us for our decision : " Had the American Ice Company on the 31st day of December, 1904, (misprint for 1894), or on the 2nd day of April, 1907, any franchise interest or right in the lands, premises and appurtenances to acquire which this proceeding was instituted and more particularly described in the petition for the appointment of commissioners herein for the taking of which said company is in this proceeding entitled to compensation ? " The two dates set forth

in this certified question refer, respectively, to the times when this proceeding was instituted by petition, and the second report of the commissioners in which the claim of the ice company was considered and denied.

The history of the *locus in quo* and of the claim of interest therein by the ice company is as follows : In 1686 the city of New York became vested with the land between high and low-water mark on the easterly shore of the North river. That was by virtue of the Dongan charter. That charter was confirmed by the Montgomerie charter of 1730, and both charters were confirmed by the colonial assembly (L. 1732, chap. 584) and the Constitution of 1777. Later the city acquired title by letters patent to an additional strip of land under water four hundred feet wide to the west of low-water mark in the North river (L. 1807, chap. 115), and still later that strip was extended to the north end of the island (L. 1826, chap. 58). In 1848, 1849 and 1850 one Caleb F. Lindsley acquired title to the uplands between Forty-second street and Forty-third street and bounded on the west by the high-water mark in the North river. These conveyances to Lindsley were followed in July, 1850, by two grants from the city to him of lands under water between Forty-second street and Forty-third street, subject to certain covenants and conditions therein set forth. From the lands described in these grants were excepted such parts as were within the boundaries of Twelfth avenue, Thirteenth avenue, Forty-second street and Forty-third street as the same were then mapped. Lindsley, the grantee, covenanted that he would, when requested or directed by the city, construct bulkheads and streets, and put pavements and sidewalks upon the latter, and keep them in repair for the use of the general public. He further covenanted that these avenues and streets should forever remain public streets for the use of the public the same as other streets in the city. It is conceded that as to Thirteenth avenue that covenant became nugatory, for that avenue was never filled in.

Lindsley was, therefore, the owner of the uplands and the lands under water between Forty-second street and Forty-

third street.   At the time when he acquired these lands there was a pier at the foot of Forty-third street which was owned by the city.   Just when or by whom this pier was built does not appear.   All that can be said with certainty is that it was in existence as early as 1837, for it is shown on a map made by City Surveyor Smith in that year.   It seems to have been continued in the same place and of the same dimensions down to November, 1852, when the city conveyed it to Lindsley.   The deed recites that in consideration of the sum of eight thousand dollars, paid by Lindsley, the city grants to him " all that certain pier in the City of New York situated at the foot of Forty-third street, North River."   This is followed by the technical boundaries of the pier, and then the grant is amplified as follows : " Together with the extent of the present width of the street with the right of wharfage thereon and together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining   *   *   *   subject to the right of the parties of the first part to order said pier extended into the river at the expense of the said party of the second part and in whatever way they may see fit, reserving to the party of the first part the right to extend said pier at the expense of the corporation of the City of New York or to grant the right to do so to other parties if the said party of the second part fail or neglect to extend said pier when ordered to do so, in which case the right to wharfage, etc., at the portion of the pier extended shall belong to the parties at whose expense the extension shall be made."   The title to the uplands, the lands under water, and the pier continued in Lindsley until November, 1855, when he conveyed them all to John La Farge, who subsequently died, leaving a will by which the titles vested in his widow and children.   From this time forward the pier property and the land under water went in different directions.   The pier property was sold in March, 1860, to Scholey, Schindler and Conklin who, in 1865, conveyed to the New York Ice Company, which, in 1867, conveyed to the Knickerbocker Ice Company.   The next transfer was to the Consolidated

Ice Company in 1896, and the last was in 1900 to the American Ice Company, the present claimant. Following the conveyance of the pier property to the New York Ice Company, which was consummated in 1860, the La Farges, in 1863, sold the water lots between Forty-second street and Forty-third street to one Appleby, who, in the same year, conveyed to the Forty-second Street and Grand Street Ferry Railroad Company, which has ever since held the title thereto. The physical features of the *locus in qno*, as they existed in 1852 and prior thereto, need not be recited at length. In 1852 the pier was forty feet wide and two hundred and eleven feet long, placed in the middle of Forty-third street as shown on Smith's map of 1837. The shore line, or high-water mark, was then considerably east of Twelfth avenue and the pier was connected with the shore by a bulkhead. Thirteenth avenue has never been laid out, and Twelfth avenue and Forty-third street at that point then existed simply on paper. The pier projected into open water and was wholly outside of any street or avenue as then actually constructed. Thus matters stood until the Laws of 1870 (Chap. 383), 1870 (Chap. 137) and 1871 (Chap. 574) were enacted providing for a department of docks and the adoption of a general plan of harbor improvement. In March, 1871, this department adopted plans which fixed a new bulkhead or exterior line considerably east of Thirteenth avenue as shown on the map of 1837, and at a distance of about one hundred and fifty feet west of Twelfth avenue. This plan shows a proposed pier forty feet wide at the foot of Forty-third street and projecting westerly beyond the bulkhead line. In September, 1873, the board of the department of docks met and adopted a resolution which recited the receipt of a petition signed by numerous residents asking that the pier at the foot of Forty-third street be repaired and enlarged so as to accommodate the shipping public at that point, and also recited the covenants for repairs and extensions contained in the deed of 1852 from the city to Lindsley. Following these recitals was a direction to the Knickerbocker Ice Company, then the

owner of the pier, to place the same in safe and proper repair
"and to extend the same at the outer end westward for a
distance of about three hundred (300) feet and of the same
width as the present pier." It was also further resolved that
the " Knickerbocker Ice Company pay the sum of Fifty dol-
lars rental per annum for the land under water belonging to
the City lying outside of the outer end of the present pier and
to be covered by the extension above authorized." A copy
of the preamble and resolution was sent to the Knickerbocker
Ice Company.    Meanwhile on November 14th the commis-
sioners of the sinking fund met and fixed the legal width of
the pier at sixty feet instead of forty feet. Following this
action the board of the dock department met on the 21st day
of November, 1873, and adopted a resolution reciting the
action of the sinking fund commissioners and granting per-
mission "to the Knickerbocker Ice Company, owner of the
present pier at the foot of Forty-third street North river (in
making the repairs and extensions to said pier ordered by this
Board by resolution adopted September 25th, 1873) to build
said pier of a width of sixty (60) feet, the width of the street,
provided, however, that when any portion of the land under
water covered by the extensions to the pier shall be required
by the City for the permanent improvement of the water
front, no claim shall be made by said company or its suc-
cessors, for damages or otherwise, for any structure or improve-
ment that may be upon the land owned by the City, and pro-
vided further that nothing herein contained shall be consid-
ered or construed as a waiver of the title of the City in and
to the land outside the dimensions of the present pier, owned
by the Knickerbocker Ice Company, as laid down in the deed
from the Mayor, Aldermen and Commonalty of the City of
New York to Caleb F. Lindsley, dated November 11, 1852,
and provided further that said Knickerbocker Ice Company
shall first agree in writing to pay to the City the sum of ($50)
Fifty Dollars per annum as rent for the use of the land under
water belonging to the City covered by said extension of twenty
feet to the width of the pier." A copy of this resolution was

sent to the Knickerbocker Ice Company, and the latter accepted in writing the offer made by the city. Pursuant to the arrangement thus made the Knickerbocker Ice Company in 1873 extended and widened its pier as directed, and gave up the old pier except as an avenue of access to the extended structure.

In December, 1890, the board of the department of docks directed the railroad company to construct the bulkhead in front of the water lots between Forty-second street and Forty-third street. This was to be done in accordance with the plan adopted by the department in 1871, and in pursuance of the covenant in the deed from the city to Lindsley in 1850. The resolution containing this direction was rescinded in 1897, but not until after the city, through the board of the department of docks, had entered into a contract with the Knickerbocker Ice Company in 1892 for the purchase of the pier, which failed of approval by the sinking fund commissioners ; and not until after the city had instituted condemnation proceedings in 1894 to acquire the title to the water lots between Forty-second street and Forty-third street " together with wharfage rights, incorporeal hereditaments, terms, easements, emoluments or other appurtenances of any kind whatsoever appurtenant to said lands under water." In 1896 the Consolidated Ice Company succeeded to the title of the Knickerbocker Ice Company in the Forty-third street pier, and in 1898 the board of the department of docks entered into an agreement with the former for the purchase of the pier. That contract also failed of consummation because not approved by the sinking fund commissioners. Then the board of the department of docks directed its engineer-in-chief to take possession of the pier upon the assumption that it had become dangerous to life and health, and it was at or about this time that the Consolidated Ice Company is said to have abandoned the pier. When the proceeding at bar was brought to a hearing the old pier had been removed, the bulkhead or sea wall between Forty-second street and Forty-third street had been built, and no new pier had been erected by the ice company.

The *locus in quo*, as changed and proposed to be changed by the improvements in progress under the direction of the department of docks, must be briefly described. As originally constructed the Forty-third street pier was forty feet wide and two hundred and eleven feet long, extending westerly from the east line of Twelfth avenue. As extended under the resolution of the board of the dock department in 1873 the pier was widened by the addition of ten feet on either side, and it was lengthened by the addition of three hundred feet. This brought the outer end of the pier five hundred and eleven feet westerly of the east boundary of Twelfth avenue. By the plan of 1871, 1873 and 1884 the line of the exterior bulk-head was placed two hundred and fifty feet westerly of the east boundary of Twelfth avenue, and the pier, which was to be in the line of the continuation of Forty-third street, was to be sixty feet wide and five hundred feet long. According to the changed plan of 1901 the pier is to be eighty feet wide and is to extend westerly a distance of seven hundred feet from the bulkhead line. This last enlarged and extended pier is not to be in the continuation of Forty-third street, however, but something like twenty feet south of the southerly line thereof. The result of this change when completed will be the erection of a pier seven hundred feet long, not on the land where the ice company claims the right to maintain a pier, but so far to the south thereof that if both piers were constructed there would be between them a canal twenty feet in width.

*Francis K. Pendleton, Corporation Counsel (Theodore Connoly and Charles D. Olendorf of counsel)*, for the City of New York, appellant. The city is not interested in the controversy between the railroad company and the ice company. (*Matter of Mayor, etc.*, 62 App. Div. 271; 168 N. Y. 254; *Matter of Daly*, 29 App. Div. 286.) Whether or not the void conveyance to Lindsley was an attempted transfer of real estate or an attempted grant of a franchise, it was illegal by reason of the fatally defective proceedings of the common

council. (*Bedlow* v. *Stilwell,* 158 N. Y. 292; *Wetmore* v. *Story,* 3 Abb. Pr. 262; 22 Barb. 414; *Matter of Beams,* 17 How. Pr. 459; *Beekman's Case,* 11 Abb. Pr. 164; 19 How. Pr. 518; *People* v. *Law,* 34 Barb. 494; 22 How. Pr. 121.)

*James A. Deering* for Forty-second Street and Grand Street Ferry Railroad Company, appellant. Conceding that when this proceeding was instituted in 1894 the Knickerbocker Ice Company had a franchise to maintain a pier at the foot of Forty-third street, and, as appurtenant thereto, an easement over the land under water between Forty-second and Forty-third streets, the American Ice Company, the present claimant, is not entitled to any compensation in this proceeding. (Lewis on Em. Domain [2d ed.], § 307; 2 Wood on Railroads, 994; *Blodgett* v. *U. & D. R. R. Co.,* 64 Barb. 580; *Robert* v. *N. P. R. R. Co.,* 158 U. S. 1.) The respondent, the American Ice Company, acquired title to the pier, or the franchise of constructing and maintaining a pier, at the foot of West Forty-third street, after the rights or easements for which compensation as claimed by it in this proceeding had been actually extinguished or destroyed. (*King* v. *Mayor, etc.,* 102 N. Y. 171; *Hatch* v. *Mayor, etc.,* 82 N. Y. 436; *People ex rel. Stephens* v. *Phillips,* 88 App. Div. 560; *People ex rel. Murtaugh* v. *Bd. of Assessors,* 58 How. Pr. 327; *Secombe* v. *Railroad Company,* 23 Wall. 108; *Searl* v. *School District,* 133 U. S. 564.) The respondent, the American Ice Company, has not, and its predecessors in title never had, a franchise or right to maintain a pier at the foot of West Forty-third street and collect revenues therefrom. (*State* v. *Mayor, etc.,* 3 Duer, 119; *Milhau* v. *Sharp,* 27 N. Y. 611; *City of Oakland* v. *Carpentier,* 13 Cal. 540; Dillon on Mun. Corp. [2d ed.] § 226; *Wetmore* v. *Story,* 22 Barb. 414; *Wetmore* v. *Law,* 34 Barb. 517; *Arkenburgh* v. *Wood,* 23 Barb. 364; *Taylor* v. *Beebe,* 3 Robt. 262; *Matter of Beekman,* 19 How. Pr. 518; *Waters Co.* v. *Texas,* 177 U. S. 444; *Bank* v. *Earle,* 13 Pet. 587.) Assuming that the respondent has a right or

franchise to maintain a pier at the foot of Forty-third street, neither that right nor any right appurtenant to its enjoyment is included in the description of the property to be taken and compensated for in this proceeding. (*Spier* v. *New Utrecht*, 49 Hun, 294; 121 N. Y. 420; *Matter of Newland Avenue*, 38 N. Y. S. R. 796; *Harris* v. *Elliott*, 10 Pet. [U. S.] 25; *Matter of Marsh*, 71 N. Y. 315; *M. El. R. Co.* v. *Dominick*, 55 Hun, 198; *Story* v. *N. Y. E. R. R. Co.*, 90 N. Y. 122; *People* v. *Comrs.*, 104 N. Y. 240; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420; *Lansing* v. *Smith*, 4 Wend. 3; *Matter of Hamilton Ave.*, 14 Barb. 403; *O. F. B. Co.* v. *Fish*, 1 Barb. Ch. 547; *F. P. B. Co.* v. *Smith*, 30 N. Y. 44; *C. W. Co.* v. *Syracuse*, 116 N. Y. 167; *E. C. S. Co.* v. *B. R. R. Co.*, 87 Hun, 279; *H. G. & C. Co.* v. *City of Hamilton*, 146 U. S. 259.)

*M. Edward Kelley* for respondent. The ice company's right to the pier, with its right of access over the land of the railroad company, has been conclusively established by the Appellate Division and by this court. (*K. I. Co.* v. *Mayor, etc.*, 176 N. Y. 408; *Matter of Mayor, etc.*, 113 App. Div. 84; *Matter of Mayor, etc.*, 121 App. Div. 702; *Smith* v. *Mayor, etc.*, 68 N. Y. 556; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129.) The validity and legal effect of the deed of 1852 is no longer an open question. (*K. I. Co.* v. *F. S. S., etc., R. Co.*, 176 N. Y. 408; *Bell* v. *City of New York*, 77 App. Div. 437, 452; *People* v. *Clark*, 9 N. Y. 349; *People* v. *Trinity Church*, 22 N. Y. 44; *Mayor, etc.*, v. *Hart*, 95 N. Y. 443; *Moore* v. *Mayor, etc.*, 73 N. Y. 238; *Trustees* v. *Smith*, 118 N. Y. 634.)

WERNER, J. The long delay in the decision of this case has been due to the repeated consideration of conflicting views upon questions as to which the members of the court are now in accord. The question in the case which underlies all others is whether the American Ice Company has a valid and existing right to maintain a pier in the North river at the foot

33

of Forty-third street.    In the case of *Knickerbocker Ice Company* v. *Forty-second Street & Grand St. Ferry R. R. Co.* (176 N. Y. 408) we held that the plaintiff there was the grantee of a "right to maintain a pier, and to collect wharfage, etc., at the foot of Forty-third street in the Hudson river, wherever that point should be located by lawful authority." The American Ice Company has succeeded to all the rights of the Knickerbocker Ice Company in the premises, and we shall briefly consider the question whether the title of the "ice company," as we shall call it, is valid or not.

Counsel for the appellants insist that the ice company never acquired a valid title to the right to build and maintain a pier because the resolution of the common council of the city of New York authorizing the grant was never legally adopted. The grant was made in 1852. At that time the common council was composed of two branches, one of which was designated as the board of aldermen, consisting of one alderman elected from each ward for a term of two years, and the other of which was called the board of assistant aldermen, consisting of one assistant alderman from each ward elected for a term of one year. These two bodies were vested with concurrent powers, which were exercised in separate sessions at different times, each body having the right to amend, reject or concur in any ordinance or resolution by a majority vote of the members elected. The charter also provided that there should be no joint committees of the council, except a committee on accounts.

This was the condition of the charter on the 18th day of November, 1851, when the board of aldermen adopted the following resolution : "Resolved that the pier, foot of Forty-third street, be sold to Caleb Lindsley, that the Commissioners of the Sinking Fund fix the price to be paid therefor, the counsel to the corporation to prepare the necessary deeds, and the proceeds thereof to be deposited in the City Treasury to the credit of the Sinking Fund for the redemption of the City debt." This resolution was

adopted by the board of assistant aldermen on the 16th day of April, 1852, and approved by the mayor on the 19th day of April, 1852. It is the contention of counsel for the appellants that this resolution never became effective to authorize the grant to Lindsley because it was not adopted by both branches of the council in the same year, and the case of *Wetmore* v. *Story* (22 Barb. 414) is cited to support it. In that case the controversy was over the validity of a street railroad franchise granted under the same charter. There, as here, one branch of the common council adopted in a given year the resolution authorizing the grant, and the other branch of the common council adopted the resolution in the following year. In passing upon the validity of that grant the Supreme Court of this state expressed the view that there was a strict analogy between the common council thus constituted and a national or state legislature composed of two co-ordinate branches; and that no act, ordinance or resolution of either branch can be valid without the concurrence of both of the bodies as constituted when the particular measure originates in either branch. It is not to be denied that there is a certain analogy between the Federal and state legislatures on the one hand, and the similarly constituted municipal legislatures on the other, but it is an analogy that can only be carried to the point where practical considerations essentially differentiate national or state legislatures from similarly constituted common councils, the co-ordinate branches of which may meet at the same time or at different periods, and whose work is of such a character that it can neither be all initiated or finished at any particular time or place of meeting, or during the continuance of any particular membership. The co-ordinate branches of the common council of the city of New York, as constituted in 1851–1852, had the power to meet at the same time or at different times. The sessions of these bodies, whether held together or at separate periods, were continuous in the sense that they were not confined to a stated term which could only be brought to a close by concurrent adjournment. Some of their transactions were obviously and neces-

sarily to be transmitted to and finished by their successors.
This is one of the fundamental differences between this com-
mon council and the state legislature. The State Constitution
of 1846, which was in force in 1851 and 1852, contained the
provision that "if any bill shall not be returned by the Gov-
ernor within ten days (Sundays excepted) after it shall have
been presented to him, the same shall be a law in like manner
as if he had signed it, unless the Legislature shall, by their
adjournment, prevent its return ; in which case *it shall not be
a law.*" The then existing provisions of the city charter were
radically different. That statute declared that "If any ordi-
nance or resolution passed by each board  *  *  *  shall not
be returned by the mayor within ten days (Sundays excepted)
after it shall have been presented to him, the same shall become
a law, in like manner as if he had signed it, unless the close of
the session of the common council shall prevent its return, in
which case it shall not be a law, until the expiration of five days,
after the commencement of the next session of the common
council, by whom the ordinance or resolution shall be recon-
sidered if returned within such time, and be disposed of in
the same manner and with like effect as if presented at the
preceding session." (L. 1849, ch. 187, sec. 6.) This sharp
contrast between the phraseology of the Constitution and of
the statute is significant. The language in the charter was
evidently used to meet the very situation that must have been
anticipated with reference to a dual common council sitting
in separate divisions on different days when there might be
unfinished business at "the close of the session of the com-
mon council." The "close" referred to was obviously not
the adjournment of one of the co-ordinate bodies on a particu-
lar day to another specified time, but the "close" of the year
when newly-elected members came in. It seems to have been
intended that despite such changes in membership all pending
matters were to be disposed of "with like effect as if presented
at the preceding session." It is true that the precise point
here at issue is not provided for in express terms in the char-
ter, but the language quoted seems clearly to recognize the

continuity of the common council and to authorize the conclusion of the business of that body which had its inception in previous sessions or years. This has been the generally accepted view of this and similar municipal charters in this state. For more than half a century the city of New York has proceeded upon this theory, and other municipalities have followed her example. If we were now to adopt the radical change contended for by the appellants, it would throw our municipal governments into great confusion and result in a disturbance of property rights that would entail incalculable loss to many innocent individuals and corporations. The idea may be very cogently illustrated by an example even more simple than that presented by the facts set forth in this record. By far the larger number of our cities have common councils composed of a single board of aldermen elected for one or two years, as the case may be. If such a body is not continuous, and terminates whenever membership is changed by election, it must follow that all matters not finished at such times die with the particular membership which originated them, and must be commenced *de novo* with every change in the personnel of the body. It will readily be perceived that the situation is one in which the logic of theory must give way before the necessities of practicalness.

It is familiar knowledge that municipal legislatures have to deal with many matters, such as the building of sewers, the installation of water works, the paving of streets and the laying out of parks which originate under one membership, are carried on by still another, and are finally finished by yet another. The exigencies of practice have made this course necessary, and by common consent it has been followed. Relying upon its validity tax rolls have been confirmed, bonds have been issued, and an infinite variety of rights and obligations have been created. A present judicial determination, based upon the theoretical views which governed the decision in *Wetmore* v. *Story (supra)*, would result in a condition of chaos beyond description. These are but a few of the considerations which render it impossible for us to follow the decision in that case.

We close this branch of the discussion by reiterating what we said in *Knickerbocker Ice Company* v. *Forty-second Street & Grand St. F. R. R. Co.* (*supra*), that the ice company was the grantee of " the right to maintain a pier, and to collect wharfage, etc., at the foot of Forty-third street in the Hudson river, wherever that point should be located by lawful authority," and we now add that the grant was a valid one.

The next question to consider is whether the right of the ice company is affected by this proceeding. That right was not to maintain a pier upon land specifically described by metes and bounds, but " at the foot of Forty-third street in the Hudson river wherever that point should be located by lawful authority." The pier granted by the city to Lindsley extended westerly into the river two hundred and eleven feet. Under proper authority it was later extended westerly a further distance of three hundred feet. There can be no doubt that ordinarily the grant of a pier right would include as appurtenant thereto a right of access over the adjacent lands under water. But the circumstances of this case are peculiar. The title to all these lands was originally in the city of New York. By two deeds dated July 1st, 1850, the city conveyed to Lindsley the lands under water to the south of Forty-third street, between high-water mark and the westerly side of Thirteenth avenue as then proposed to be laid out. These deeds contained the following convenant: that the grantee or his successors should " within three months next after he shall be thereunto required  *  *  *  at his own proper costs and charges, build, erect, make and finish or cause to be built, erected, made and finished, according to any resolution or ordinance  *  *  *  already passed or adopted, or that may hereafter be passed or adopted, five good and sufficient bulkheads, wharves, streets or avenues, which shall form so much and such parts of Forty-third street and of the Twelfth and Thirteenth avenues as fall within the limits of the premises first above described and are reserved as aforesaid from out thereof for public streets, and will fill in the same with good and sufficient earth and regulate and pave the

same, and lay the sidewalks thereof." Also that the said grantee, or his successors, "shall and will from time to time and at all times forever hereafter, at his own proper costs, charges and expenses, uphold and keep in good order and repair the whole of these parts of the said Forty-third street and of the Twelfth and Thirteenth avenues, which the said party of the second part hath covenanted and agreed to make, erect and build as aforesaid."

The first fact which challenges attention in this connection is that the city had the right at any time to have the bulkhead erected and the land easterly thereof filled in. The pier, even as extended in 1873, fell far short of reaching the westerly line of Thirteenth avenue. This being the situation the deed of the pier right cannot be construed as conferring any right of access from or over the lands which the city might at its pleasure caused to be filled in. It is obvious, of course, that so long as this territory was not filled in it served the purposes of access to the pier, but that was merely a privilege by sufferance and not a legal right. Thus when the city built the present bulkhead on a line easterly of Thirteenth avenue, as that street appeared upon the map in 1852, it invaded no property rights of the pier owners, as they had no easements over the land under the water within the bulkhead. Nor have the pier owners any right to compensation for damages to the structure, because that might at any time have been rendered worthless as a pier by the filling in of the land as far westerly as Thirteenth avenue. But it does not follow that the ice company has no property rights in the premises whatever. Its alleged right to an easement over the lands sought to be condemned in this proceeding, and its actual right to maintain a pier at the foot of Forty-third street, are two separate things. Conceding, for the purposes of this discussion, that the ice company has now no pier at the foot of Forty-third street, it still retains the right to maintain a pier at that point, and that right cannot be destroyed without compensation. The city is now building, or proposes to build, a new pier extending seven hundred

feet westerly into the Hudson river on a line but twenty feet south of the southerly line of Forty-third street extended. This new pier, when erected, will practically destroy the franchise of the ice company to build and maintain a pier at the foot of Forty-third street. While the city clearly has the power to acquire this right or franchise owned by the ice company, the latter is quite as clearly entitled to compensation for being deprived of that right. But neither of these considerations arise in the proceeding at bar, because it relates only to land under water between Forty-third street on the north, Forty-second street on the south, Thirteenth avenue on the west and Twelfth avenue on the east, "together with all wharfage rights, incorporeal hereditaments, terms, easements, emoluments, privileges or other appurtenances of any kind whatsoever appurtenant to the bulkhead along the westerly side of Thirteenth avenue in front of the above-described premises." If it were necessary it could be clearly demonstrated that under the very language of the petition in this proceeding just quoted the ice company would not be entitled to any award in this proceeding because none of its rights are appurtenant to the premises sought to be condemned. The ice company's franchise can only be acquired by the city in a separate proceeding brought for that purpose.

The foregoing facts necessarily lead to the conclusion that the commissioners of appraisal acted correctly in denying to the ice company any award and that the Special Term was right in confirming the report of the commissioners. This view necessitates the reversal of the order of the Appellate Division and the affirmance of the order of the Special Term, with costs in both courts to the appellant. The question certified to us is answered in the negative.

CULLEN, Ch. J., HAIGHT, VANN, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Order reversed, etc.