APPLEBY ET AL. *v.* CITY OF NEW YORK ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 15. Argued October 7, 1925; reargued March 1, 2, 1926.— Decided June 1, 1926.

1. Upon review of a decision of a state court enforcing a state law over the objection that it impairs the obligation of a prior contract, this court must decide whether there was a contract, what was its proper construction and effect, and whether its obligation was impaired. P. 379.

2. And although the construction and effect of the contract involved depend on questions of state law, this court must determine those questions, independently of the conclusion of the state court. *Id.*

3. Whether grants by a city of land under navigable waters, to private persons, free from subsequent regulatory control over the water and the land, were within the power of the city and the legislature, is a state question, to be determined by the law of the State, as it was when the deeds were executed. P. 380.

4. Upon the American Revolution, all the proprietary rights of the Crown and Parliament in, and all their dominion over, lands under tidewater vested in the several States, subject to the powers surrendered to the National Government by the Constitution of the United States. P. 381.

5. Deeds made by the City of New York, in 1852–53, with approval of the legislature, conveying lots below tidewater in the Hudson River, extending out from the original high water mark to a line then established as the exterior line and *ripa* of the city, with the right to fill in, and with all the advantages and emoluments of wharfage on that line at the ends of the lots, were within the power of the legislature and city, being made on valuable consideration and for the public purpose of harbor development; and they conveyed both the *jus publicum* and the *jus privatum,* to be regained by the State and city only through condemnation proceedings. Pp. 381, 384, 388, 399.

6. Delay of the grantees in filling in such lots did not preserve in the city the power to regulate navigation over the parts unfilled next the river,—the grants being in fee simple absolute with no covenant by the grantees to fill in, or other breach of duty in that regard. P. 399.

7. Subsequently to these grants, the State, by Acts of 1857 and 1871, established a bulkhead line inshore from the exterior line bounding the lots, forbade solid filling, but permitted piers, beyond the bulkhead line, and limited the water spaces permissible between piers to 100 feet. The same bulkhead line was adopted later by the Secretary of War. The city built piers out from that line at the ends of streets crossing or adjacent to the granted premises, leased accommodations on the piers, constructed a platform or dumping board overhanging one of the waterlots, and dredged and appropriated the submerged lots, both inside and outside of the bulkhead line, with the result that the lots were converted into slips for accommodation of the city's tenants, in use constantly by vessels moored and fastened alongside the piers, discharging cargo. *Held:*

(1) That these acts by the city were in trespass upon the rights of the lot-owners, and that the state laws of 1857 and 1871, as applied by the state court to uphold the city's conduct, were an unconstitutional impairment of the contracts with the lot-owners. P. 398.

(2) That the order of the Secretary of War, fixing the bulkhead line but allowing pier extensions beyond it, did not revest the city with proprietary or regulatory rights over the lots out-shore from the bulkhead line or the parts still unfilled within that line, inconsistent with the rights of the lot-owners to fill in to that line and to erect piers beyond it, in accordance with the federal regulation. P. 400.

(3) That owners were entitled to an injunction against the above-described trespasses of the city. P. 402.

235 N. Y. 351; 199 App. Div. 539; reversed.

This is a writ of error to review the judgment of the Supreme Court of New York as affirmed by the Court of Appeals. *Appleby* v. *City of New York,* 199 App. Div. 539; 235 N. Y. 351. The plaintiffs are executors of Charles E. Appleby, and hold deeds in fee simple from the City of New York, made in 1853 and 1852, one to their testator Appleby, and one to Latou, who later con-

veyed to Appleby. The land conveyed consists of two
water lots in the City of New York on the east side of
North River. This suit was brought in 1914 to restrain
the defendant, the City of New York, and its co-defend-
ants, lessees of the city's piers, from dredging the land
under water conveyed by the deeds, and from using the
water over the lots of the plaintiffs as slips and mooring
places for vessels alongside those piers.

The Appellate Division and the Court of Appeals de-
nied relief. This is a writ of error under § 237 of the
Judicial Code, sued out on the ground that by its judg-
ment the Supreme Court of New York has upheld and
enforced statutes of the State enacted in 1857 and 1871
in such a way as to impair the obligation of the plaintiffs'
deeds, in violation of section 10, Article I, of the Federal
Constitution.

The City of New York was established before the Rev-
olution by a charter of Governor Dongan in 1686, and by
a subsequent charter of Governor Montgomery of 1730,
under both of which it acquired title to the tideway,
i. e., the strip between high and low water, surrounding
the island of Manhattan. These grants were confirmed by
the Constitution of 1777 of the State of New York. By
the Act of 1807, Laws of 1807, p. 125, c. 115, the State
granted to the city a strip of land under water along the
westerly side of the Island, which extended from low
water mark westerly into the Hudson River, a distance of
400 feet.

In 1837, the Legislature passed a law, Laws of 1837,
c. 182, making 13th Avenue as laid out by the city sur-
veyor the permanent exterior street along the easterly
shore of the North or Hudson River in the district where
these lots are. It extended the streets already laid out
to 13th Avenue, and further provided that it should be
construed to grant to the city forever the said lands under
water easterly of 13th Avenue

In pursuance of this law, ordinances were passed by the Sinking Fund Trustees of New York providing that the lands under water belonging to the city under its several charters might be sold and conveyed by such city to parties desiring to purchase the same, giving priority to the owners of the adjacent uplands. The ordinances were recognized and approved by the State Legislature in c. 225 of the Laws of 1845, and the city then made the deeds here to be considered.

The grant to Appleby was made on August 1, 1853, for the consideration of $6,367.37; that to Latou on December 24, 1852, for $4,937.50. The one covered land under water between 39th and 40th Streets and high water mark and 13th Avenue, the other land between 40th and 41st Streets and high water mark and 13th Avenue. The wording and covenants of the deeds were alike, *mutatis mutandis*. It will be enough to describe the Appleby deed. That granted

"All that certain water lot or vacant ground and soil under water to be made land and gained out of the Hudson or North river or harbor of New York and bounded described and containing as follows—that is to say:—

" Beginning at a point of intersection of the line of original high-water mark with the line of the centre of Thirty-ninth Street and running thence Westerly, along said centre line of Thirty-ninth Street, about one thousand and sixty-five feet to the Westerly line or side of Thirteenth Avenue, said Westerly line or side of the Thirteenth Avenue, being the permanent exterior line of said City, as established by law, thence Northerly along the westerly line or side of the Thirteenth Avenue, two hundred and fifty-eight feet, four and one-half inches to a line running through the centre of Fortieth Street; thence Easterly, along said centre line of Fortieth Street, about one thousand one hundred and twenty-six feet, eleven

inches to the line of original high-water mark, and thence in a Southerly direction along said centre line of original high-water mark, as it runs to the point or place of beginning, as particularly described designated and shown on a map hereto annexed dated New York, June 1853, made by John J. Serrel, City Surveyor, and to which reference may be had; said map being considered a part of this Indenture.

"The premises conveyed being colored pink on said map, be the same dimensions more or less.

"Saving and reserving from and out of the hereby granted premises, so much thereof, as by said map annexed forms part or portions of the Twelfth and Thirteenth Avenues Thirty-ninth and Fortieth Streets for the uses and purposes of Public Streets. . . .

"To have and to hold the said premises hereby granted to the said Charles E. Appleby, his heirs and assigns to his own proper use, benefit and behoof forever."

The pink map of lot referred to in the deed faces this page.

Appleby in the deed covenanted with the city that, within three months after the city required it, he would build four bulkheads and wharves, and fill in and pave such parts of 12th and 13th Avenues and 39th and 40th Streets as lay within the premises described, and keep them in repair, with the provision that in default the city might make them at the cost of Appleby, or sell and dispose of the premises or any part at public auction to supply the deficiency, and grant the land and the wharfage to other persons. Appleby further covenanted to pay all taxes on the lot and not to build the wharves, bulkheads, avenues or streets until permission was given by the city.

The city covenanted that Appleby and his heirs and assigns should receive "all manner of wharfage, cranage advantages or emoluments growing or accruing by or from that part of the said exterior line of the said city, lying

# NORTH OR HUDSONS RIVER

on the westerly side of the hereby granted premises fronting on the Hudson River, excepting therefrom wharfage from the westerly end of the bulkhead in front of the entire width of the northerly half part of 39th Street and the southerly half part of 40th Street, which were reserved to the City."

At the time of these deeds, there was no filling between the high water mark and 12th Avenue, but since that time and before 1871, the lots were filled by Appleby from high water mark to within 4 feet of the easterly side of 12th Avenue, a distance of approximately 500 feet.

In 1855, Laws of 1855, c. 121, for the avowed reason that grants had been made and piers built which obstructed the river navigation, provision was made for a harbor commission to prepare plans for harbor improvement, and as a result chapter 763, Laws of 1857, was passed to establish for the harbor bulkhead and pier lines. In its second section it provided:

" It shall not be lawful to fill in with earth, stone, or other solid material in the waters of said port, beyond the bulkhead line or line of solid filling hereby established, nor shall it be lawful to erect any structure exterior to the said bulkhead line, except the sea wall mentioned in the first section of this act, and piers which shall not exceed seventy feet in width respectively, with intervening water spaces of at least one hundred feet, nor shall it be lawful to extend such pier or piers beyond the exterior or pier line, nor beyond, or outside of the said sea wall." .

In the same year, by virtue of the act the Harbor Commission established a bulkhead line beyond which there could be no solid filling at 100 feet west of 12th Avenue.

The necessary effect of this legislation and action if made effective was to abolish 13th Avenue as a *ripa* or exterior line on the river, and to prevent the filling of plaintiffs' lots outshore from the bulkhead line and the making of docks on the lots and the enjoyment of wharfage at the ends thereof within 100 feet of the city's piers.

By the Laws of 1871, c. 574, which amended § 99 of the
Act of April 5, 1870, relating to the government of the
City of New York, it was provided that the Department
of Docks should be established, that it should determine
upon such plans as it deemed wise. for the whole or any
part of the water front, and submit them to the Commis-
sioners of the Sinking Fund, who might adopt or reject
any such plan. · After the plan was adopted no wharf,
pier, bulkhead, basin, dock, slip or any wharf, structure
or superstructure should thereafter be laid out or con-
structed within the territory or district embraced in and
specified upon such plan except in accordance with the
plan. The Department was authorized in the Act of
1871 to acquire, in the name and for the benefit of the city,
any and all wharf property in the city to which the city
had no right or title and any rights and easements and any
rights, terms, easements and privileges pertaining to any
wharf property in the city and not owned by the city, by
purchase or by condemnation. By the Act of 1871, the
bulkhead line for solid filling was fixed at 150 feet west of
12th Avenue, instead of 100 feet as previously fixed.

In 1890, the Secretary of War fixed the same bulkhead
line as that fixed by Dock Commissioner under the Act
of 1871. Thereupon, in 1894, a condemnation proceeding
was begun by the city against Appleby to appropriate
both lots. It was delayed for 20 years, presumably for
a lack of funds. In 1914, it was discontinued by the city.
This action was commenced shortly thereafter.

During the pendency of the condemnation proceeding,
the city constructed concrete and steel piers against
plaintiffs' objection within the lines of west 39th Street,
of 40th Street and 41st Street, beginning at or near 12th
Avenue and extending westerly to and beyond 13th Ave-
nue. It placed thereon iron or steel sheds and leased
these to tenants, excluding the public from the piers. The
piers have numerous doors and windows which open on

to the water over the Appleby lots, so that boats are constantly moored and fastened alongside of the piers and in the adjoining slips upon plaintiffs' premises and discharge their cargoes and freight into the sheds. The city also constructed an overhanging dumping board or platform extending northerly from the 39th Street pier for the use of its tenants over the same water. The city has from time to time dredged plaintiffs' premises between its piers without their consent to a depth of about 20 feet, and threatens to continue to do so. West of the bulkhead line the depth of water varied from 4 feet in 1884 to 20 feet now. East of the line the bottom was an average depth of 3 feet and was dredged to 16 or 20 feet as far east as 50 feet from the west side of 12th Avenue, or 100 feet inside the bulkhead line. The record contains reports in ten years, between 1895 and 1905, showing dredging of about 150,000 cubic yards in the two slips or basins. From its piers, made more valuable by the use of these slips and mooring places, the city receives substantial rentals and income from its lessees and other occupants of the piers.

No request was ever made by the city that Appleby should fill the streets which he covenanted to fill on the city's call and not to fill until that. After the Act of 1871, the city built the piers, and the streets and avenues specified in the deeds, so far as they have been built. 13th Avenue being out shore from the bulkhead line fixed in 1857 and 1871 was never filled.

In January, 1917, the plaintiffs were required to pay as back taxes upon these lots the sum of $74,426.01.

The prayer of the petition is that the city and its tenants and the other defendants be enjoined from using plaintiffs' lots as a slip or permanent mooring place and from dredging them.

The special term of the Supreme Court held that the deeds here in question conveyed a fee simple title to the

plaintiffs, carrying both the *jus publicum* and the *jus privatum,* and that their rights could not be affected by the Act of 1857 and the Act of 1871, or the orders of the Dock Commissioners under that Act, but that the establishment of the bulkhead line by the Secretary of War in 1890 made the waters of the Hudson River westerly of that line open and in use for purposes of commerce and navigation, and that no action to restrain or prevent the use of that water for loading or unloading at the city piers would lie, but that the city was without right to dredge any soil or part of the granted premises east of the bulkhead line, and should be enjoined from doing so. The special term refused damages for the dredging which had been done for failure to adduce proper evidence as to what the damages were, and allowed only a nominal recovery.

On appeal, the Appellate Division also held that the deeds carried to the plaintiffs the *jus publicum* and the *jus privatum* from the city and the State, and that the plaintiffs' rights under the deeds could not be affected by the Acts of 1857 and 1871, but closed its findings and conclusions as follows:

" The Federal statutes and the action of the Secretary of War in establishing a bulkhead line across the granted premises thereby constituted the waters beyond said bulkhead line navigable waters, and though the Federal Government established a pierhead line further west in the river, as the Federal Government did not attempt to provide regulations as to the building of piers, wharves or docks within said space, the State Government had a right to regulate the construction of docks, piers and wharves between said bulkhead line and pierhead lines, and having by Chapter 763 of the Laws of 1857 provided that no piers should be erected within 100 feet of another pier, and having by Chapter 574 of the Laws of 1871 as supplemented and amended, authorized the City of New

York through its officials, to adopt a plan for water front of the City of New York, including the erection of piers thereon and the City having pursuant to said resolution adopted a plan requiring piers to be erected in 39th, 40th and 41st Streets, and said piers having been erected, thereby prevented the plaintiffs from erecting any pier, wharf or other structure whatsoever upon their premises under water between the said bulkhead line established by the Secretary of War and 13th Avenue.

" The plaintiffs are not entitled to an injunction restraining The City of New York from using or authorizing the use by others of the plaintiffs premises either within or without the Federal bulkhead line, for the purpose of mooring, docking and floating boats."

The Court of Appeals in its opinion, affirming the decree of the Appellate Division, after referring to the laws of 1857 and 1871 as the basis of the contention of the city that the plaintiffs were not entitled to relief, said:

" When the secretary of war established the bulkhead line, the title of the state, the city and its grantees beyond such line was subordinated to such use of the submerged lands as should be required for the public right of navigation. No private property right requiring compensation was taken or destroyed by the establishment of such line. The owner's title was subject to the use which the United States might make of it. Plaintiffs have no authority to fill in any portion of their lands west of the bulkhead line. The city of New York in the execution of its plans for the improvement of the water front westerly of such line for the purpose of navigation invaded no right of plaintiffs."

The Court said further that, if the plaintiffs' lots easterly of the bulkhead line had been actually filled in, they would no longer be lands under water and would be completely subject to the plaintiffs' control, but that so long as they remained unfilled and under water, they were sub-

ject to the sovereign power of the State and city to regulate the use of the water over them for purposes of navigation, and accordingly held that in respect to them the city had invaded no right of the plaintiffs. The opinion of the Court of Appeals indicates that previous decisions of the court contain dicta in respect of the *jus publicum* and *jus privatum* that can not be sustained.

*Mr. Charles E. Hughes,* with whom *Mr. Banton Moore* was on the briefs, for plaintiffs in error.

It was competent for the State of New York to establish the *ripa* about the City of New York and to make or provide for grants on valuable consideration of title in fee simple in pursuance of a plan for water front improvement. Such action was subject to the controlling authority of Congress in the regulation of interstate and foreign commerce, but aside from conflict with that paramount authority and as between the State and grantees, the grants made by the State or by the city under its authority are inviolable. *Hardin* v. *Jordan,* 140 U. S. 371; *Seattle* v. *Oregon & Wash. R. R. Co.,* 255 U. S. 56; *Towle* v. *Remsen,* 70 N. Y. 303; *Langdon* v. *Mayor,* 93 N. Y. 129; *Williams* v. *Mayor,* 105 N. Y. 419; *People* v. *Del. & Hud. Co.,* 213 N. Y. 194; *People* v. *Steeplechase Park Co.,* 218 N. Y. 459; *Mayor* v. *Law,* 125 N. Y. 380.

The grants in question conveyed title in fee simple to the premises described. The *jus publicum* was extinguished and the grants conveyed absolute title to the grantees according to the terms of the grants. *Towle* v. *Remsen,* 70 N. Y. 303; *Duryea* v. *Mayor,* 62 N. Y. 592; *Langdon* v. *Mayor,* 93 N. Y. 129; *Mayor* v. *Law,* 125 N. Y. 380; *Furman* v. *Mayor,* 10 N. Y. 567; *Williams* v. *Mayor,* 105 N. Y. 419; *Appleby* v. *New York,* 199 App. Div. 539; 235 N. Y. 351.

The action of the Secretary of War in defining bulkhead and pierhead lines merely limited the plaintiffs' rights accordingly. They still enjoyed the absolute right to fill in up to the bulkhead line so determined and to improve their premises beyond the bulkhead line in a manner consistent with the lines of the Secretary of War. The attempt of the State, and the city under its authority, to prevent the erection of piers over the plaintiffs' premises outside the bulkhead line and not in conflict with the Secretary of War's pierhead line was a violation of the plaintiffs' rights of property.

With respect to the requirement of permission by the city for the making of the plaintiffs' improvements, this Court will determine for itself the true construction of the grants. The true construction of the grants is that the plaintiffs are entitled to improve the granted premises in accordance with the terms of the grants at their pleasure and without the consent of the City of New York. At most, the city could insist upon a reasonable police supervision. *Appleby* v. *Delaney*, 235 N. Y. 364; *Duryea* v. *Mayor*, 62 N. Y. 592; *Mayor* v. *Law*, 125 N. Y. 380.

The adoption of the new plans of 1871 and 1916 by the Department of Docks with the approval of the Commissioners of the Sinking Fund, under the provisions of the Act of 1871, and the Greater New York Charter, was legislative action, within the meaning of the contract clause of the Federal Constitution. *New Orleans Water Works Co.* v. *Louisiana Ref. Co.*, 125 U. S. 18; *Williams* v. *Bruffy*, 96 U. S. 176; *Walla Walla City* v. *Walla Walla Water Works Co.*, 172 U. S. 1; *Mercantile Trust & Deposit Co.* v. *Columbus*, 203 U. S. 311; *Zucht* v. *King*, 260 U. S. 174.

*Mr. William C. Cannon* for Weehawken Stock Yard Company, submitted.

*Mr. Charles J. Nehrbas,* with whom *Mr. George P. Nicholson* was on the briefs, for City of New York.

The acts of the State do not amount either to a taking of property or the impairment of the obligation of a contract. The courts of New York have held that the title of the City of New York and of its grantees to the land under the waters of the Hudson River is not absolute and unqualified, but is subject to such regulations as the public authorities may impose respecting the use of the water front. This has been the uniform course of adjudication upon this subject in the State of New York for many years. *Knickerbocker Ice Co.* v. *42d St. R. R. Co.,* 176 N. Y. 408; *American Ice Co.* v. *New York,* 217 N. Y. 402; *People* v. *N. Y. & S. I. Ferry Co.,* 68 N. Y. 71.

In *Langdon* v. *Mayor,* 93 N. Y. 129, and *Williams* v. *Mayor,* 105 N. Y. 419, and similar cases, it appeared that the lands granted had been fully filled in, and had thus ceased to be within the domain of the regulatory power over navigable waters. These decisions apply, for example, to the land of the plaintiffs east of Twelfth Avenue, which we admit neither the State nor the city has the power to disturb. In *People* v. *Steeplechase Park Co.,* 218 N. Y. 459, it was held that the State has the power to convey such title to the foreshore as will permit the grantee to erect structures which prevent the passage of the public. There is nothing in that case which is inconsistent with our contention in the case at bar. Under these decisions, it seems clear that the plaintiffs hold the property subject to the regulations of its use by the Secretary of War and the state authorities.

The courts of New York have restrained the city and the other defendants from interfering with the plaintiffs' rights inshore of the bulkhead line, and the defendants do not seek to review such determination. It thus appears that the controversy in the present case deals entirely with

the land under water outshore of the bulkhead line.    The only regulation by the federal government outshore of the bulkhead line is the pierhead line established by the Secretary of War, a considerable distance beyond the lands in controversy.

Plaintiffs' sole ground of complaint is the establishment, by the state authorities, inshore of the federal pier line, of limitations respecting the width and location of piers.    The plan adopted by the State provides for piers at the foots of the streets, and for slips between the piers. The plaintiffs complain that they are thus deprived of their property, and that their contract rights have been impaired.    This Court has held that a State has the power to restrict the building of piers and wharves where the federal government has made no restrictions, or where the State's regulations do not conflict with those of the United States.    *Montgomery* v. *Portland,* 190 U. S. 89.

The regulatory acts of the State affect all.    All must use their property in the manner provided by the regulatory authority.    All land under navigable water is subject to regulation with respect to the manner of its improvement.    This is absolutely necessary in order that proper provision may be made for navigation.

The lands in question, lying as they do beneath the waters of the Hudson River, are subject to the public right of navigation.    Because of the action of the public authorities, the lands in question may not be filled, but must remain under water.    It necessarily follows that they may be navigated by the public, by the plaintiff, and by the defendant.    It has often been stated that the State may grant land under water in such a manner and under such circumstances that the grantee becomes a proprietor to the same extent as a proprietor of upland. This may be true where the land under water granted consists of shallows unsuitable for general navigation, and where the grantee has actually filled in the lands and made upland of them.    It may be conceded, as a general

proposition, that where an owner has lawfully filled in land under water with the consent of both the federal and state authorities it becomes upland, free from the trust subject to which land under water is held, and free from the regulatory power of the State over navigable waters. *Appleby* v. *New York*, 235 N. Y. 351.

The consent of the federal and state authorities is evidenced by the establishment of bulkhead lines, to which solid filling is permitted. By permitting filling out to a reasonable depth of water, vessels are enabled to moor alongside the shore or at piers extending therefrom. Outshore of the bulkhead, however, are navigable waters. Here, every private right is subordinate to the rights of the public. All ownership is subject to public regulation. No right, whether of ownership or otherwise, can be granted which will prevent the full and free exercise of the regulatory power of Congress and of the State.

The Secretary of War has limited the distance to which piers may be extended; the State has prescribed their location and width. This is neither a taking of property nor an infringement of the plaintiffs' granted rights. It is an exercise of sovereign power to which all land under navigable waters is subject. *Prosser* v. *Northern Pacific R. Co.*, 152 U. S. 59; *Greenleaf Johnson Co.* v. *Garrison*, 237 U. S. 251; *Tampa Water Works* v. *Tampa*, 199 U. S. 241; *Sou. Wis. Ry.* v. *Madison*, 240 U. S. 457; *Milwaukee Elec. Ry.* v. *Milwaukee*, 252 U. S. 100.

Questions concerning the rights of grantees of lands under navigable waters are purely local; moreover, the doctrine of the New York courts is in accordance with the decisions of this Court in similar cases. *Martin* v. *Waddell*, 16 Pet. 367; *Shively* v. *Bowlby*, 152 U. S. 1; *Philadelphia Co.* v. *Stimson*, 223 U. S. 605; *Port of Seattle* v. *Oregon R. R. Co.*, 255 U. S. 56; *Packer* v. *Bird*, 137 U. S. 661; *Sanitary Dist.* v. *United States*, 266 U. S. 405; *Lumber Co.* v. *Garrison*, 237 U. S. 251; *Lewis Blue Point Co.* v. *Briggs*, 229 U. S. 82.

The piers and sheds at the foot of 39th, 40th and 41st streets are lawfully maintained. Plaintiffs contend that these are in the beds of public streets and constitute a diversion of the same from street uses. This contention overlooks the fact that, under· regulations both of the federal and state governments, there may be no solid filling beyond a point about 150 feet west of Twelfth Avenue. Where there can be no solid filling, obviously there can be no public street. Plaintiffs complain that we have built piers instead of streets. Any structure except a pier would be a violation of governmental regulations, a purpresture, a nuisance and a crime against the United States. *People* v. *Vanderbilt,* 26 N. Y. 287; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605.

The lands under water ·in controversy may be dredged to facilitate navigation. *Lewis Blue Point Co.* v. *Briggs,* 198 N. Y. 287 (aff'd. ·229 U. S. 82); *Tempel* v. *United States,* 248 U. S. 121.

The affirmance by the Court of Appeals does not carry with it any approval of the conclusions of law made by the Appellate Division.

MR. CHIEF JUSTICE TAFT, after stating the case as above, delivered the opinion of the Court.

The plaintiffs in their writ of error charge that the judgment of the Supreme Court of New York, as affirmed by the Court of Appeals, has interpreted and enforced the Acts of 1857 and 1871 in such a way as to impair the obligation of the contract in their deeds.

The questions we have here to determine are, first, was there a contract, second, what was its proper construction and effect, and, third, was its obligation impaired by subsequent legislation as enforced by the state court? These questions we must answer independently of the conclusion of that court. Of course we should give all proper weight

to its judgment, but we can not perform our duty to enforce the guaranty of the Federal Constitution as to the inviolability of contracts by state legislative action unless we give the questions independent consideration. It makes no difference what the answer to them involves, whether it turns on issues of general or purely local law, we can not surrender the duty to exercise our own judgment. In the case before us, the construction and effect of the contract involved in the deeds and covenants depend chiefly upon the extent of the power of the State and city to part with property under navigable waters to private persons, free from subsequent regulatory control of the water over the land and the land itself. That is a state question, and we must determine it from the law of the State, as it was when the deeds were executed, to be derived from statutes then in force and from the decisions of the state court then and since made; but we must give our own judgment derived from such sources and not accept the present conclusion of the state court without inquiry.

Ordinarily this Court must receive from the court of last resort of a State its statement of state law as final and conclusive, but the rule is different in a case like this. *Jefferson Bank* v. *Skelly,* 1 Black. 436, 443; *University* v. *People,* 99 U. S. 309, 321; *New Orleans Water Company* v. *Louisiana Sugar Company,* 125 U. S. 18, 38; *Huntington* v. *Attwill,* 146 U. S. 657, 684; *Mobile & Ohio Railroad* v. *Tennessee,* 153 U. S. 486; *Louisiana Railway & Navigation Company* v. *New Orleans,* 235 U. S. 164, 170, 171; *Long Sault Co.* v. *Call,* 242 U. S. 272, 277; *Columbia Railway* v. *South Carolina,* 261 U. S. 236, 245.

We must also consider here what effect the action of the United States in its dominant control over tidal waters for the preservation and promotion of navigation has had in affecting or destroying the rights of the plaintiffs

claimed to have been impaired by the Acts of 1857 and 1871, and consider whether such action has rendered the state legislative impairment innocuous and deprived plaintiffs of the right to complain of it.

Upon the American Revolution, all the proprietary rights of the Crown and Parliament in, and all their dominion over, lands under tidewater vested in the several States, subject to the powers surrendered to the National Government by the Constitution of the United States. *Shively* v. *Bowlby,* 152 U. S. 1. The rights of the plaintiffs in error under the two deeds here in question, with their covenants, are to be determined then by the law of New York as it was at the time of their execution and delivery. They were not deeds of gift—they were deeds for valuable consideration paid in money at the time, and a large amount of taxes on the lots have been collected from the plaintiffs by reason of their ownership. The principle applicable in the construction of grants of lands under navigable waters in the State of New York was announced by the Supreme Court of Errors in 1829, in *Lansing* v. *Smith,* 4 Wend 1. In that case, which has always been regarded as a leading one, the commissioners of the Land Office in New York granted without valuable consideration to an upland owner land under water on which he erected a wharf after filling in the same. Thereafter the legislature authorized the erection of a mole or pier in the river for the purpose of constructing a basin for the safety and protection of canal boats, and this mole or pier entirely encompassed the wharf on the side of the water so as to leave no communication between it and the river except through a sloop lock at one extremity of the basin. It was held that the loss sustained by the owner was *damnum absque injuria;* that the grant only conveyed the land described in it by metes and bounds, and, being in derogation of the rights of the public, nothing would be implied.

Chancellor Walworth, speaking for the Court of Errors of the State, said:

" By the common law, the king as *parens patriae* owned the soil under all the waters of all navigable rivers or arms of the sea where the tide regularly ebbs and flows, including the shore or bank to high water mark. He held these rights, not for his own benefit, but for the benefit of his subjects at large; who were entitled to the free use of the sea, and all tide waters, for the purposes of navigation, fishing, etc., subject to such regulations and restrictions as the crown or the parliament might prescribe. By *magna charta*, and many subsequent statutes, the powers of the king are limited, and he can not now deprive his subjects of these rights by granting the public navigable waters to individuals. But there can be no doubt of the right of parliament in England, or the legislature of this state, to make such grants, when they do not interfere with the vested rights of particular individuals. . . . The right to navigate the public waters of the state and to fish therein, and the right to use the public highways, are all *public* rights belonging to the people at large. They are not the *private* unalienable rights of each individual. Hence the legislature as the representatives of the public may restrict and regulate the exercise of those rights in such manner as may be deemed most beneficial to the public at large; provided they do not interfere with vested rights which have been granted to individuals."

In the case of *New York* v. *New York & Staten Island Ferry Company*, 68 N. Y. 71, the Court of Appeals, speaking of the common law, said, at p. 77:

" But while the sovereign can make no grant in derogation of the common right of passage over navigable waters, parliament may do so. . . . But a person claiming a special right in a navigable river or arm of the sea under a grant by parliament, as for example, a right to obstruct it, or to interfere in any way with the public easement,

must show a clear title.   It will not be presumed that the legislature intended to destroy or abridge the public right for private benefit, and words of doubtful or equivocal import will not work this consequence.   . . . (at p. 78.) The State, in place of the crown, holds the title, as trustee of a public trust, but the legislature may, as the representative of the people, grant the soil, or confer an exclusive privilege in tidewaters, or authorize a use inconsistent with the public right, subject to the paramount control of congress, through laws passed, in pursuance of the power to regulate commerce, given by the federal Constitution."

In that case the question involved the effect of a legislative grant of lands under water, so far as appears without valuable consideration, by the land commission of the State, in 1818, to one John Gore, on the eastern shore of Staten Island, including the premises thereafter acquired by the New York & Staten Island Ferry Company.   The grant extended from low water mark into the Bay a distance of 500 feet, to have and to hold to Gore, his heirs and assigns, as a good and indefeasible estate of inheritance forever, under a statute authorizing the grant of such lands as the Commissioners should " deem necessary to promote the commerce of the state."   It was held that, as there was nothing to show that it was intended to restrict the State in the preservation of the navigation of the river in that 500 feet, the grant to Gore might be and was restricted by the subsequent statute of 1857 of the State of New York, providing that it should not be lawful to fill in the land granted with earth or other solid material beyond the bulkhead line established under that law, or by piers that should exceed 70 feet in width, with intervening water spaces of at least 100 feet between them. It was therefore decided that the erection of a clubhouse on the land granted was a purpresture.

It is apparent from these decisions that, under the law of New York when these cases were decided, whenever

the legislature deemed it to be in the public interest to grant a deed in fee simple to land under tidal waters and exclude itself from its exercise as sovereign of the *jus publicum,* that is the power to preserve and regulate navigation, it might do so; but that the conclusion that it had thus excluded the *jus publicum* could only be reached upon clear evidence of its intention and of the public interest in promotion of which it acted.

What is thus declared as the law of New York in these two cases, where it was found that the *jus publicum* had not been conveyed, is shown in a number of cases in the Court of Appeals in which the State and its agency, the city, did part with the *jus publicum* to private owners of land under tidal water, and of wharfage rights thereon, upon adequate compensation and in pursuance of a plan of harbor improvement for the public interest.

In the case of *Duryea* v. *The Mayor,* 62 N. Y. 592, and 96 N. Y. 477, a deed of land under tidal water by the City of New York, with the authority of the State, conferred upon the grantees a fee simple title with all the privileges of an absolute owner, except as restricted by the covenants and reservations contained in it. The covenants related to the filling of the streets running through the lots which were excepted from the grant. The grantees had partially filled the water lots and, while this was being done, the city had flowed the land with the contents of a sewer. The sewer had been placed under a revocable license of the owner, but, when the license was withdrawn, the city insisted on continuing to use the lots for sewer discharge, and this it was held the city could not do.

In the later case, in 1884, the Court of Appeals, speaking of the deed, said, at p. 477:

"As we have before seen the deed conferred upon the grantees therein the title and absolute ownership of the property conveyed, subject only to be defeated at the option of the grantor for a breach of the condition subsequent.

"The claim now made, that there was some right or interest in the property which still remained in the city notwithstanding its deed, is opposed to the principles declared in our former decision, and the express language of the conveyance."

In *Towle* v. *Remsen*, 70 N. Y. 303, 308, the Court of Appeals, in dealing with the effect of a deed of New York City of land under tidal waters, said:

"The land under water originally belonged to the Crown of Great Britain, and passed by the Revolution to the State of New York. The portion between high and low water mark, known as the *tide-way*, was granted to the city by the early charters (Dongan charter §§ 3 and 14; Montgomerie charter, § 37), and the corporation have an absolute fee in the same (*Nott* v. *Thayer*, 2 Bosw. 61). It necessarily follows that the city had a perfect right, when it granted to the devisees of Clarke, to make the grant of their portion of the land in fee simple absolute. As to the land outside of the *tide-way*, the city took title under chapter 115 of the laws of 1807, with a proviso giving the pre-emptive right to the owners of the adjacent land in all grants made by the corporation of lands under water granted by said act. . . . The Legislature left it to the city to dispose of the interests mentioned upon the proviso referred to; but it enacted no condition that it should not dispose of that which it owned in fee simple upon such terms as it deemed proper, and in the absence of any such enactment, such a condition can not be implied."

A deed of this class came before the Court of Appeals in *Langdon* v. *The Mayor*, 93 N. Y. 129. The State Commissioners of the Land Office, under a law of 1807, granted to the city a strip of land under water in the North River, the westerly line of which was in the river 400 feet west of the low water mark. The city laid out an extension of West Street along this strip, parallel with the river, the

westerly line of the street being about 200 feet out in the river west of low water mark. In 1810 the city granted to Astor, the owner of the adjoining uplands, certain lands under water, including a portion of the strip, the westerly bounds of the grant being " the permanent line of West street, saving and reserving so much of the same as will be necessary to make West street in accordance with the map or plan." In consideration of the grant the grantee covenanted to pay certain perpetual rents, to make such wharves as should be necessary to make the portion of West Street, within the bounds of the grant, of the width specified, and forever thereafter to maintain and keep them in repair. The city covenanted that the grantee should at all times thereafter have the wharfage, from the wharf or wharves to be erected on the west end of the premises granted. Astor constructed West Street across the land granted, in accordance with his covenant, and maintained the wharf on the westerly line of said street. Without making compensation to the plaintiff who succeeded to his title, the city erected a bulkhead out shore from such westerly line and filled up the space between it and the old bulkhead, and destroyed the use of the wharf. It was contended that the city and State could not part with the power to preserve and regulate navigation in the water between the wharf and the 200 feet beyond owned by the city. The Court of Appeals held that the covenant as to the wharf which the city made to Astor in the deed was a grant of an incorporeal hereditament of wharfage which the city or State could not impair; that the city acquired by its grant from the State the right to fill up the land granted, to build wharves thereon and to receive wharfage; that whatever property rights it thus acquired it could convey to individuals; that, by its grant to Astor, the city conveyed not only the land, excepting the part covered by West Street, but also the right of wharfage; that an

easement, i. e., a perpetual right of free access to the
wharf across West Street over the land of the city therein,
passed by necessary implication; that the city had the
right to grant such easement; that the legislature could
not by the act in question authorize a destruction or
impairment of this easement without compensation to
the owner; and that, therefore, the action for damages
was maintainable.

In the course of his opinion for the court, Judge Earl,
speaking of the power of the city conferred upon it by the
State, said, at page 144:

"Here, taking the language of the charters and grants,
the course of legislation, and all the statutes in *pari ma-
teria*, the situation of the lands granted and the use to
which many portions of them had, with the knowledge
and consent of the legislature, been from time to time
devoted, it is very clear that the lands under water around
the city were conveyed to it in fee, to enable it to fill them
up as the interest of the city might require, and to regu-
late and control the wharves and wharfage.

"We think it equally clear that whatever title and
property rights the city thus obtained, it could transfer
and convey to individuals. Having the power to extend
the *ripa* around the city, and thus make dry land, it could
authorize any individual to do it. Whatever wharves and
docks it could build, it could authorize individuals to
build, and whatever wharfage it could take, it could
authorize individuals to take. Its dominion over the
lands under water, certainly for the purposes indicated
in the preamble contained in section 15 above cited, was
complete."

Speaking of the wharfage granted, the judge said, at
page 152:

"An easement for access to the wharf over the adjacent
land of the city under water passed by necessary impli-
cation. Without the easement the wharf would be of no

use, there could be no wharfage, and the grant as to the wharf and wharfage would be futile. The grant was made for an adequate valuable consideration. It was not made solely or primarily for the benefit of the grantee, but primarily for the benefit of the city in pursuance of a policy for improving its harbor and furnishing its treasury. Under such circumstances there is no rule of construction which can confine the grant to the metes and bounds mentioned in the deed. If the city had owned this wharf and granted it, the right to wharfage and an easement for access to the wharf over the adjacent land of the city under water would have passed by necessary implication as incidents and appurtenances of the thing granted. So it would seem that a grant of the right to build and forever maintain a wharf upon the land of the city, would upon the same principle carry with it the right to take the wharfage and have access to the wharf. In addition to the right to build and maintain the wharf, however, here there was on the part of the city an express grant of the wharfage, and it must have been the intention of the parties that the grantee should have open water in front of his wharf for the accommodation of vessels that the wharfage which was granted to him might be earned."

The necessary effect of the *Langdon Case,* which has always been a leading authority in the State of New York, is that a grant upon a valuable consideration of the easement of wharfage related to land under water conveyed by the city by authority of the State, for the purpose of promoting commerce and the harbor of the city, takes away from the city and State the power to regulate navigation in any way which would interfere with or obstruct the grant, and that if the city desired in the interest of navigation to obstruct such easement, it must acquire it by condemnation. If it may do this, it follows necessarily that it may by an absolute deed of land under

water, with the right of the grantee to fill it, part with
its own power to regulate the navigation of water over
this land which would interfere with its ownership and
enjoyment by the grantee.

The *Langdon Case* was approved and followed in the
case of *Williams* v. *City of New York,* 105 N. Y. 419. In
that case, the city under New York laws of 1813 and
1857, was held to have received authority from the State
to fill in the east side of the Hudson River from an exist-
ing bulkhead to 13th Avenue with a new bulkhead there.
The city made a grant to a private person of the land
under water some eighty feet, with a requirement that he
fill it in and build the new bulkhead with wharfage on the
outer bulkhead. It was held that he took a fee, that he
had an easement for the approach of vessels in its front,
and that the property thus granted him could not be
taken by the city for the public use without compensa-
tion. The court said in that case:

" The authority thus given being commensurate with
the municipal limits, involved a grant of so much of the
land of the State under water as those wharves would
occupy if the city's choice of location required such ap-
propriation. This right was tantamount to an owner-
ship. It embraced the entire beneficial interest, and was
inconsistent with any title remaining in the State. The
wharf when built completely occupied the land under
water, and might be built, if need be, of stone and earth.
All use for the floating of vessels disappeared, so far as it
occupied the water. The new and substituted use created
by the city or its grantees belonged wholly to them, for
the entire benefit in the form of shippage, wharfage and
cranage, was given to them. There was never any re-
straint put upon this general grant, and the ownership
involved where the plans carried the wharves on to the
State's land in the stream, except the limitation of ex-
terior lines beyond which the authority should not go,

or that imposed by general plans agreed upon by both
parties. . . .

". . . So that when the State granted to the city
wharf rights which might extend into the deep water
covering its own land it granted two things: property in
the land covered by the wharf and occupied by it and an
easement for approach of vessels in its front. That ease-
ment the State by its own sole action could not take away
or destroy without awarding adequate compensation."

The same principle was announced in *Mayor* v. *Law*,
125 N. Y. 380.

In *People* v. *Steeplechase Park Company*, 218 N. Y.
459, it was held that where the State, through its land
commissioners, unqualifiedly granted to defendants lands
in navigable waters between high and low water marks,
the exclusive use and right of possession vested in the
grantee. Hogan, Cardozo and Seabury, Judges, dissented.
The ruling went to the extent of deciding that fences,
barriers, platforms, pavilions and other structures of a
private amusement park constructed by the grantee on
lands under navigable water between high and low water
mark, although an interference with the public use of and
access to such lands, could not be enjoined where the
grant of such lands was unqualified.

In that case, at pp. 479, 480, the court said:

" During all our history the legislature and the courts
have recognized that the public interest may require or
at least justify a limited restriction of the boundaries of
navigable waters. The public interest may require the
building of docks and piers to facilitate approach to the
channel of such navigable waters. The beneficial enjoy-
ment of land adjoining the channel of public waters may
require or at least justify the conveyance of lands below
high water on which to erect buildings. As in England
the crown and Parliament can without limitation convey
land under public waters, so in this state land under

water below high-water mark can be conveyed by the legislature, or in accordance with constitutional and legislative direction. Where the state has conveyed lands without restriction intending to grant a fee therein for beneficial enjoyment, the title of the grantee except as against the rights of riparian or littoral owners, is absolute, and unless the grant is attacked for some reason recognized as a ground for attack by the courts or the use thereof is prevented by the Federal government, there is no authority for an injunction against its legitimate use."

The *Duryea* and the *Langdon* cases rest on the delegation by the State to the city of the State's sovereign right to control navigation or the *jus publicum* in the land to be disposed of by the city to private owners in pursuit of the promotion of filling land under water to a *ripa* or exterior line, and of the construction of docks to make a harbor. The rights of such private owners come not from riparian rights, or gratuitous statutory grants. They come from a deed absolute of the lots conveyed for a money consideration. The *Steeplechase Park Case* was a close case, as shown by the dissents, and was not nearly so strong a one for the application of the principle above stated as the case at bar, or the *Duryea* and *Langdon* cases.

If we are right in our conclusion as to the effect of these deeds under the law of New York at the time of their execution, then there can be no doubt that the laws of 1857 and 1871 as enforced in this case impair the contract made by the city with the grantees of these deeds.

Cases cited as contrary to the New York City water lot decisions just considered must be examined to see whether they involve grants of lots under tidewater by deed absolute in fee simple from the city or State in consideration of money paid and in promotion of harbor plans or other public purposes.

The *Knickerbocker Ice Co. v. 42nd R. Co.,* 176 N. Y. 408, is relied on to show a conclusion adverse to the infer-

ences we have drawn as to the New York law. There the Court of Appeals sustained an order denying an injunction to restrain the city from effecting an extension of 43d Street into the Hudson River, sought by one who by deed of the city was given the right to wharfage at the end of 43d Street. In the same deed land under water on each side of the street was conveyed to the grantee in fee simple. The Court held that the street was held in trust by the city for the public use and that the grant of wharfage at the end of the street did not carry the fee in the street, but only an easement of wharfage at the end of the street as the city might extend it into the river, and that, by virtue of a covenant in the deed, the grantee if he would enjoy the wharfage must erect a new wharf or pier at the new end of the extended street. The grant was not of the fee but only of an ambulatory easement of wharfage on any extension of the street. But the city was nevertheless thereafter required to condemn this grant of the easement. *American Ice Company* v. *City of New York,* 193 N. Y. 673, and 217 N. Y. 402.

The case of *Sage* v. *Mayor,* 154 N. Y. 61, 79, does not conflict in any way with the *Langdon* and other cases. That only concerned the right of a riparian owner in the tideway which the city owned and deeded to another. It was held that the riparian owner had no more right to complain of the city's disposition of the tideway for the public interest by deed than had the owner of a United States patent reaching to high water mark to complain of the State's disposition of the tideway in Oregon in *Shively* v. *Bowlby, supra.*

The cases of *Brookhaven* v. *Smith,* 188 N. Y. 74, and *Barnes* v. *Midland R. R. Terminal Company,* 193 N. Y. 378, concern conflicting rights of riparian owners and of persons with limited grants to put out a wharf without any fee simple title, and seem to us to have no bearing upon the question here.

In *Lewis Blue Point Co.* v. *Briggs,* 198 N. Y. 287, grantees under deeds made before 1700, conveying the exclusive right of fishing, leased for ten years the right to plant and cultivate oysters in the navigable waters of the Great South Bay, Long Island. The lessees were held subject to an Act of Congress authorizing and directing the dredging of a channel 2,000 feet long and 200 feet wide through their oyster beds, without claim for compensation. It was held that they had derived no more right in the fishery than the King had in his private ownership, and he could not convey the right to restrict navigation which he held in trust for the public. The colonial grant, therefore, which was not like a grant from the State, did not exclude the sovereign right to provide for navigation. Moreover, it was a federal right which the owners were opposing, and of course they had to yield. *Tempel* v. *United States,* 248 U. S. 121; *Lewis Blue Point Oyster Company* v. *Briggs,* 229 U. S. 82.

It is urged against our view of what these deeds conveyed, of the sovereign power of the State and the ownership of the city at the time of their execution, that it is opposed to the judgment of this Court in *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, in which the validity of a grant by the Illinois legislature to the Illinois Central Railroad Company of more than 1,000 acres, in the harbor of Chicago in Lake Michigan, was under consideration. It was more than three times the area of the outer harbor, and not only included all that harbor, but embraced the adjoining submerged lands which would in all probability be thereafter included in the harbor. It was held that it was not conceivable that a legislature could divest the State of this absolutely in the interest of a private corporation, that it was a gross perversion of the trust over the property under which it was held, an abdication of sovereign governmental power, and that a grant of such right was invalid. The limitations on the

doctrine were stated by Mr. Justice Field, who delivered the opinion, as follows, at page 452:

" The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks, and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, can not be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant

of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled."

· That case arose in the Circuit Court of the United States, and the conclusion reached was necessarily a statement of Illinois law, but the general principle and the exception have been recognized the country over and have been approved in several cases in the State of New York.

In *Coxe* v. *State,* 144 N. Y. 396, a company was created to re-claim and drain all or any portion of the wet or overflowed lands and tidewater marshes on or adjacent to Staten Island and Long Island, except such portions of the same as were included within the corporate limits of any city, upon the deposit of $25,000 and the payment to the State of a sum to be fixed by a commission after doing the work. This was a suit to recover a $25,000 deposit, because the Attorney General had decided the law to be unconstitutional. The Court followed the *Illinois Central Railroad Case,* and held the law invalid, but said:

· " For every purpose which may be useful, convenient or necessary to the public, the state has the unquestionable right to make grants in fee or conditionally for the beneficial use of the grantee, or to promote commerce according to their terms. The extensive grant to the city of New York of the lands under water below the shore line around Manhattan island clearly comes within this principle, since it was a grant to a municipality, constituting a political division of the state, for the promotion of the commercial prosperity of the city and consequently of the people of the state." Citing *Langdon* v. *Mayor,* 93 N. Y. 129.

The opinion says:

" The title which the state holds and the power of disposition is an incident and part of its sovereignty that can not be surrendered, alienated or delegated, except for some public purpose, or some reasonable use which can fairly be said to be for the public benefit." ·

The same rule and exception are laid down in *Long Sault Development Company* v. *Kennedy,* 212 N. Y. 1, where the Legislature of New York attempted to give complete control of the navigation of the St. Lawrence River in the region of Long Sault Rapids, to a private corporation, and abdicate its sovereign function. The court held the grant invalid, but said, in stating the exception:

" The power of the Legislature to grant land under navigable waters to private persons or corporations for beneficial enjoyment has been exercised too long and has been affirmed by this Court too often to be open to serious question at this late day." Citing *Lansing* v. *Smith, supra; New York* v. *New York & Staten Island Ferry Company, supra;* and *Langdon* v. *The Mayor, supra;* and added,

" . . . The contemplated use, however, must be reasonable and one which can fairly be said to be for the public benefit or not injurious to the Public."

There is an interesting discussion of the same exception by Chief Justice Bartlett in *People* v. *Steeplechase Park, supra,* at p. 482, in which he cites *United States* v. *Mission Rock Company,* 189 U. S. 391, 406, and emphasizes the distinction between the *Illinois Central,* the *Coxe,* and *Long Sault* cases, and grants like those we are considering. It is clear that the ruling in those cases has no application here.

But it is said, and the court below held, that the fee simple granted by the deeds in this case did not exclude the right of the city to regulate and preserve navigation over the waters covering the land conveyed until they were filled, and that this distinguishes the *Duryea, Langdon,* and other cases, in which the filling had taken place, from the present one.

The suggestion that rights of ownership in lands under water conveyed by the city, by such a deed in fee simple,

are restricted, and the city's control of navigation of the water over them remains complete until they are filled, can not be accepted without qualification in respect of grants which are intended to part both with the *jus publicum* and *jus privatum,* as we have found these deeds to do. The suggestion does not find support in the case of *First Construction Company of Brooklyn* v. *State,* 221 N. Y. 295, cited to sustain it. In that case, Beard was an upland owner whose land bordered on Gowanus Bay. The legislature in three acts granted. to a private person the right to build wharves and fill in lands in a salt meadow marsh and mud flats partially submerged at high tides. The court, Hiscock, C. J., in stating the case, said, p. 303:

"It may be stated generally that none of them [the legislative acts] did more than grant to Beard and others the privilege to build wharves, etc., and fill in lands; none of them purported in terms to grant and convey the title to lands under water included within the area now appropriated, and none of them was passed by a two thirds vote."

It was held that no title could pass, because it was a gratuity, and no grant could be made under the Constitution without a two-thirds vote of the legislature, which was not the case here, and that it was only a privilege or franchise which could not ripen into a title until the land was filled. It does not bear on the case here except in the necessary inference from the treatment of the matter in the opinion that, if title had passed, filling was not necessary. to vest full fee simple in the grantee.

Of course we do not intend to say that, under such deeds as these, as long as water connected with the river remains over the land conveyed and to be filled, navigation may not go on and boats may not ply over it, and that, incident to such use, occasional mooring may not take place. But it is a very different thing to say that

the city which has parted with the *jus publicum* and *jus privatum* over such water lots, remains in unrestricted control of navigation with the right to dredge them, or appropriate the water over them as a slip or regular mooring place for its adjoining piers, in the doing of a great business, largely excluding plaintiffs and all others from use of the water over those lots, for the constant private use of the city's tenants, for its profit. This distinction and conclusion is borne out by the decision of the Court of Appeals in *In re Mayor of The City*, 193 N. Y. 503, where the court was dealing with the question of the elements of value of a pier-right in the Hudson River, granted by the city to an individual in a deed with covenants quite like those in this case, when the pier adjoined an unfilled water lot of the city. The court said:

. "The deed of the pierhead can not be construed as conferring any right of access from or over the lands which the city might at its pleasure cause to be filled in. It is obvious of course that so long as this territory was not filled in, it served the purpose of access to the pier, but that was merely a privilege of sufferance and not a legal right."

The evidence shows that two slips between the city piers at 39th Street and 40th Street, and those between 40th Street and 41st Street, are usually blocked with coal barges, with railroad floats carrying box cars on them, with cattle boats using a runway for cattle at the side of the piers; and all are being moored in the slips for the use and benefit of the lessees and other tenants of the city for the pecuniary profit of the city. This and the dredging of the soil of the plaintiffs certainly are more than a privilege of sufferance. *Whitaker* v. *Burhans*, 62 Barb. 237; *Wall* v. *Pittsburg Harbor Co.*, 152 Pa. 427.

The wharfage rights of the city at the piers in 39th, 40th and 41st Streets as far as 13th Avenue, under the deeds before us, cover only the ends of those piers and not

their sides. This is clear, because the grantees of the deeds were vested with the wharfage on 13th Avenue along the river extending from 39th Street to 41st Street, except that at the ends of the cross streets. In this state of the case, the rights of the city, having parted with the sovereign regulation of navigation in the water over these lots, are not different from those of the owner of the upland who builds out his pier to deep water. His right is limited to the front or end of the pier for his private use.

Judge Cullen, in *Jenks* v. *Miller,* 14 App. Div. 480, points out that " though the owner of an adjacent upland has the right of access to the river, and also the right to construct a proper pier thereon, he has no easement or interest in the lands under water in front of the adjacent proprietors, and that the riparian right of access, so far as it is a proper right incident to the ownership of the upland, is strictly a right of access by the front."

The same principle is approved in *Consumers Coal & Ice Company* v. *City of New York,* 181 App. Div. 388, 394, where it is said that privately owned land under public waters is subject to the navigation of vessels over it, but can not be appropriated by others to enlarge the berths at private piers. Compare *Keyport Steamboat Company* v. *Transportation Co.,* 18 N. J. Eq. 511, 515; *United States* v. *Bain,* 24 Fed. Cases 940, No. 14496.

Our conclusions are that Appleby and Latou were vested with the fee simple title in the lots conveyed, and with a grant of the wharfage at the ends of the lots on the river; that with respect to the water over those lots and the wharfage, the State and the city had parted with the *jus publicum* and the *jus privatum;* and that the city can only be revested with them by a condemnation of the rights granted.

What, then, is the effect upon the rights of the parties of the fact that the grantees only filled the part of lots

conveyed east of 12th Avenue?   The plaintiffs are not
in default in this, because there was no covenant on their
part to fill.  *Duryea* v. *Mayor, supra,* at p. 596; 96 N. Y.
477, 496; *Mayor* v. *Lane, supra,* at p. 391.  The filling
was left to their convenience.  They were not in default
with reference to filling in the streets and avenues, be-
cause their covenant to do so was only on condition that
the city should require it, and only when it did so.  The
reason for their delay in filling the remainder of the lots
beyond 12th Avenue was doubtless due to the passage
of the Act of 1857 and of the Act of 1871, and their rea-
sonable expectation that the city would condemn their
rights—an expectation that was confirmed by the condem-
nation proceeding which was directed to be begun in 1890
by the Dock Commission, and was begun in 1894, and re-
mained without prosecution, and operated as a dead hand
upon this property for twenty years until 1914, when the
city discontinued it.  Thereupon this suit was promptly
brought.

The rights of the plaintiff with reference to the use of
the water over their lots lying between the bulkhead line
and 12th Avenue are not affected by the order of the Sec-
retary of War.  The evidence shows that for 100 feet or
more inside the line the water over these lots is made
part of the slip and city mooring place for the city's pier;
that in order to adapt it to such a purpose the soil in the
lots is being constantly dredged, the dredging having in-
creased the depth of the water from three feet to sixteen
and twenty feet.  This has been done by the city on the
assumption that, because it is water connected with the
river, the city may improve its navigation.  As the city
has parted with the *jus publicum* in respect of these lots,
it may not exercise this power, and must be content with
sailing over it with boats as it finds it.  The dredging
of the mud to a depth of fifteen feet in their lots is a
trespass upon the plaintiffs' rights.  They have a right, at

their convenience, to fill both lots from the bulkhead line
easterly to 12th Avenue and beyond. And we know from
a record in a related case, argued with this and to be
decided this day, that they have applied for permission to
fill the lots and are pressing their right to do so. So, too,
the use of the water over these lots inside the bulkhead
line, for mooring places, berths or slips, by the city and
its tenants, as we have shown, violates the rights of the
plaintiffs. They are entitled to an injunction against
both.

The order of the Secretary of War, of 1890, fixing the
bulkhead line 150 feet west of 12th Avenue, and allow-
ing pier extensions far beyond 13th Avenue, to 700 feet
from the bulkhead line, does not take away the right of
the plaintiffs to object to the city's dredging their lots
or to its using the water over their lots for what is in effect
an exclusive slip and mooring place. The order did not
restore to the city the power, as against these plaintiffs,
to regulate navigation over their lots, and so did not make
the Act of 1857 and the Act of 1871 with respect to the
spacing of 100 feet between piers and for mooring places
adjoining the piers effective to defeat those deeds. The
action of the city in making these deeds and covenants
was of course subject to the dominant right of the Gov-
ernment of the United States to control navigation, but
the exercise of that dominant right did not revest in the
city a control and proprietary right which it had parted
with by solemn deed and covenant to these plaintiffs.

The only just and possible result of the Secretary of
War's order is that the enjoyment by the plaintiffs of
their rights under the deeds is qualified to the extent of a
compliance with it, without conferring any affirmative
power upon the city to detract from the rights which it
had granted. The plaintiffs are prevented from solidly
filling between the bulkhead line and 13th Avenue; but
the order expressly authorizes the substitution for such

filling of the construction of piers on piling driven into the lots of the plaintiffs. To whom is given the right to build piers over these lots? The Government does not attempt to take it away from the owners of the lots. It does not attempt to vest it in the city. It could not do so if it would. The right must reside in those who have the ownership of the land under the water and who, until the Secretary had made his order, were entitled by their grants to use the solid filling up to the line of 13th Avenue, without reference to the bulkhead lines or to the 100 feet spacing between the piers under the Acts of 1857 or 1871.

The lots have been bought and paid for subject only to control by the General Government in the interest of navigation. The General Government, through its agent, says it does not require open water for navigation, but is sufficiently satisfied by piers on piles extending over the water. The city has by deed granted to the Applebys the wharfage and cranage rights upon these lots. What is there to prevent the Applebys, by the construction of piers on piles over their lots, in conformity to the Secretary of War's order, from enjoying the profit from that wharfage?

It thus is seen that the limitations on the right of the city to use the water over the lots outshore from the bulkhead line are no different from what they are inshore of the bulkhead line. The right of the city in respect to the use of the water over the lots beyond the bulkhead line is, as is said in *In re Mayor of the City, supra,* already quoted, merely a privilege by sufferance and not a legal right, and lasts only until these lots may be covered by piers on piles as allowed by the Secretary of War.

The plaintiffs are therefore entitled also to an injunction to prevent the dredging of their lots by the city from the bulkhead line to 13th Avenue, and also to prevent the continued use of the water over their lots in that same

extent as a slip or permanent mooring place for the adjoining piers of the city. They are also entitled to a specific injunction against the overhanging platform which was put out by the city for its tenants on the north side of the 39th Street pier.

The application of the Acts of 1857 and 1871 by the courts of New York would reduce the rights which were intended to be conveyed in these deeds to practically nothing, and would leave the grantees only the privilege of paying taxes for something quite unsubstantial. The qualification of those rights by the order of the Secretary of War still leaves value in the deeds, if the Acts of 1857 and 1871 are invalid, as we hold them to be when applied as they have been in this case.

The judgment of the Supreme Court of New York is reversed for further proceedings not inconsistent with this opinion.

*Reversed.*