ROWEKAMP et al. v. MERCANTILE–COMMERCE BANK & TRUST CO. et al.

No. 9886.

Circuit Court of Appeals, Eighth Circuit.

Sept. 4, 1934.

Henry Davis, of St. Louis, Mo. (Thomas S. McPheeters and Bryan, Williams, Cave & McPheeters, all of St. Louis, Mo., on the brief), for appellants Frank Rowekamp et al.

J. F. Loughborough, of Little Rock, Ark. (George B. Rose, D. H. Cantrell, A. W. Dobyns, and A. F. House, all of Little Rock, Ark., on the brief), for appellant Mercantile-Commerce Bank & Trust Co.

Truman Post Young, of St. Louis, Mo. (John M. Holmes and Thompson, Mitchell, Thompson & Young, all of St. Louis, Mo., on the brief), for appellees.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

In proceedings not here involved, the lower court, pursuant to statutory provision of the state of Arkansas, appointed a receiver for the Southeast Arkansas levee district, a public corporation organized and existing under the laws of Arkansas. The ground for the appointment of a receiver recognized by the Arkansas statutes was the default in payment of certain obligations of the district. The question of the liability of the district to the various owners and holders of bonds of the district was presented to the lower court by intervening petitions and cross-petitions.

There is in the hands of the receiver approximately $100,000 of money available for payment on these obligations, and the only question involved is that of priority. The facts giving rise to this controversy are as follows:

The Southeast Arkansas levee district was created by act of the Arkansas Legislature in 1917 (Acts 1917, p. 367). It absorbed and merged certain other then existing levee districts, each of which had been created by legislative enactment authorizing it to sue and to be sued, and to construct and maintain levees against the waters of the Arkansas and Mississippi rivers. This district as created included, not only the lands situated within the boundaries of its predecessor districts, but also other lands not theretofore included in any levee district. These districts were called the Chicot levee district, the Linwood and Auburn levee district, the Red Fork levee district, and the Desha levee district.

Prior to the creation of the Southeast Arkansas levee district, these predecessor districts had each issued bonds, and the Southeast Arkansas levee district, upon and subsequent to its creation, issued successive series

of bonds. These bonded obligations may be classified as follows:

(1) Bonds issued by the predecessor levee districts prior to the creation of the Southeast Arkansas levee district by Act No. 83 of the 1917 Session Laws (page 367), which act absorbed and incorporated these prior districts into the Southeast Arkansas levee district. All of these predecessor levee districts, except the Desha levee district, had outstanding bonds that are now in default as to principal and interest. The acts relating to the Linwood and Auburn levee district and the Chicot levee district pledged the first revenues for payment of the bonds. The act creating the Red Fork levee district authorized the directors to pledge and collect the revenue, and an instrument of pledge was accordingly executed by that district. The tax levied in the Red Fork levee district was fixed at 2 per cent. of the assessed value; in the Linwood and Auburn levee district at not exceeding one-half of 1 per cent.; while in the Chicot levee district it was made the duty of the board of levee inspectors to vote and have levied annually a sufficient percentage of tax to pay the annual interest on the bonds, and to produce at least $4,000 annually in a sinking fund to pay the bonds at maturity.

(2) Bonds issued under Act No. 83, of 1917 (page 367), creating the Southeast Arkansas levee district. This act provided that the new district should assume and pay all the legal obligations of the four predecessor levee districts. Section 4. It contained the following pertinent provisions:

"Section 2. The object of this Act is the protection of the people, their land and personal property, railroads, tramroads, telephone, telegraph and electric light and power lines, and all other property from the overflow waters of the Mississippi and Arkansas rivers by a system of levee building, constructing and enlarging and maintaining the same along the banks of the Mississippi river and as far up and along the banks of the Arkansas river as is necessary to get the relief sought by this Act, and to this end the board of directors of the Southeast Arkansas Levee District as hereafter set out shall have such powers as are necessary to carry out the scheme of protection sought to be accomplished, in co-operation with the Mississippi River Commission and the Tensas Basin Levee Board of Louisiana."

"Section 6. The said levee board shall have power, and it is hereby made their duty, to construct, enlarge and maintain levees along the Mississippi and Arkansas rivers in accordance with this Act, and to protect and maintain the same in such effective condition as honest, able and energetic effort on their part may attain. They shall have power to employ all agents necessary to the execution of their duty. They shall determine the crown, height, slopes and grades of the levees and make all needful regulations and do all acts in their opinion necessary to secure the district from overflow by the waters of the Mississippi and Arkansas rivers."

"Section 10. The taxes herein levied shall constitute a lien, and are a lien, on all of the property in said levee district, against which they are assessed, and said taxes shall be collected by the collector of State and county taxes in the various counties in said levee district, and payment thereof enforced in the same manner as taxes for State and county purposes, except as hereinbefore provided, provided, that said taxes shall be payable in lawful money of the United States. * * *

"Section 11. For the purposes of constructing, maintaining and repairing the levees heretofore mentioned, said board shall have the power to borrow money from time to time as temporary loans, at a rate of interest not exceeding 6% per annum, and may direct the president and secretary to issue the necessary evidence of indebtedness for that purpose. Said board may also issue interest-bearing certificates for a term of not exceeding three years, and bearing a like rate of interest.

"For the purpose of funding each such outstanding notes or certificates, and for the purposes of funding and meeting the obligations incurred by the Chicot Levee District, the Desha Levee District, the Red Fork Levee District, and the Linwood and Auburn Levee District, and now outstanding, and for the purpose of constructing, maintaining, enlarging and repairing the levees within said district, the Southeast Arkansas Levee District is hereby authorized to issue its negotiable bonds to the amount of and not exceeding one million two hundred thousand dollars, interest payable semi-annually, at a rate of not exceeding 6% per annum, payable in lawful money of the United States, at such places and times as said board in said district may deem best. Said bonds shall not be sold at less than par.

"All notes, certificates and bonds shall be signed by the president and countersigned by the secretary, and the seal of the district attached thereto. The board is hereby required to set aside annually from the first revenue collected from any source whatever, a suffi-

cient sum to pay the interest for the year on all outstanding notes, certificates and bonds, and any notes, certificates and installments of bonds that may become due in the year, and for the purpose of securing the payment of said notes, certificates and bonds, and interest, a lien is hereby charged on all lands, lots, railroad embankments and tramways, and all other property in said district subject to levee tax paramount to all other liens. For the purpose of paying said notes, certificates and bonds and interest, said board may execute an instrument of pledge in due form of law.

"Section 12. If any note, certificate, bond or interest coupon, or any other evidence of indebtedness, issued by said board is not paid within the thirty days after its maturity, it shall be the duty of the chancery court to which application is made, in any county in the district, on the application of any holder of indebtedness, so past due, to appoint a receiver for said district, and all collectors shall thereafter pay all levee taxes collected to said receiver, and said receiver shall apply the same to the payment of all such past due notes, certificates, bonds and coupons, and other evidences of indebtedness, until all are paid, including all cost, when said receivership shall cease and said receiver shall under order of said chancery court deliver all of his records, papers and unexpended funds to the secretary of said district."

"Section 27. When the levees on the Mississippi and Arkansas rivers are up to standard in every respect and it is found that more revenue is produced by the taxes herein levied than is required for maintenance, expenses and maturing indebtedness, said board of directors shall reduce the tax pro rata to actual requirements for maintenance, expenses and maturing indebtedness."

On January 1, 1918, $600,000 of bonds were issued by the district, of which $342,000 were outstanding at the time of trial.

The act (section 8, p. 376) provided that benefited property within the district should be taxed annually to pay the obligations, as follows: (1) Agricultural lands, 10 cents per acre; (2) town real estate, 10 mills on the dollar of the assessed value as assessed for state and county taxes; (3) railroad rights of way and roadbeds, $125 per mile; (4) tramways, $25 per mile; (5) telephone, telegraph, and electric light and power lines and pipe lines, 10 mills on the assessed value thereof as assessed for state and county taxes.

A pledge instrument was executed by the district to secure the bonds, but, as it could not alter nor enlarge the obligation of the district, we omit reciting the provisions of the pledge. The pledge instrument was duly recorded prior to the sale of any bonds. Subsequent to the enactment of Act No. 83 of 1917, no taxes were levied under the prior laws relating to the four predecessor districts, but taxes were levied and collected under Act No. 83.

(3) Bonds issued subsequent to 1917. By Act No. 93, Sp. Acts 1919 (page 140), which was amendatory of Act No. 83 of 1917 (sections 8, 11, pp. 376, 380), all tax levies as provided by the act of 1917 were doubled, and the total amount of the authorized bond issue was increased to $2,000,000 (sections 3, 4, pp. 145, 146). On October 1, 1919, $600,000 of bonds were issued of which $490,000 were outstanding at the time of trial. On March 1, 1921, another $400,000 bond issue was made, none of which had been retired at the time of the trial. In 1923, by Act No. 139, Sp. Acts 1923 (page 260), still amending the act of 1917, the tax was again increased. This act tripled the tax on all classes of property as provided in the original Act of 1917, except that the taxes on railroads and tramways remained only doubled. It increased the authorized bond issue to $3,000,000 (sections 1, 2, pp. 261, 263).

Generally speaking, then, the bonds involved were issued either by the predecessor districts, or by the Southeast Arkansas levee district, but the last-named district put out successive issues, $1,200,000 of which purported to be authorized by the act of 1917, and the other subsequent issues by the above-noted subsequent legislative acts. At the time of the trial there were outstanding bonds of the predecessor districts, aggregating $180,500, and bonds of the Southeast Arkansas levee district, including successive issues, $2,233,000.

From 1917 to 1931 the property in the Southeast Arkansas levee district, including the property theretofore within the predecessor districts, was assessed and taxed as authorized by these various statutes, except that for two or three years it was not considered necessary to increase the taxes as authorized by the 1923 act. The taxpayer either paid the full amount of the tax, or defaulted in its payment, and the full amounts received were then used for the payment of all interest obligations and all outstanding bonds, with no effort to segregate the first 10 cents levied under the 1917 act, the second 10 cents levied under the 1919 act, and the third 10 cents levied under the 1923 act, and apply the funds

so segregated to the payment of the various bond issues authorized and issued under the various acts in force at the time of their issuance. Nor was any attempt made to segregate the tax arising from property in the predecessor districts.

All acts subsequent to the 1917 act contained provisions identical with those in the 1917 act with reference to the payment of interest and principal of bonds. They made the bonds a charge on taxes levied, pledging the revenues to pay the bonds, and an instrument of pledge was delivered as in the case of the first bond issue.

The lower court decreed that none of the bond issues was entitled to priority of payment, but that all bonds issued or assumed by the Southeast Arkansas levee district had equal rights in the tax collections, and should be on a parity. The appellants, representing bonds issued by the predecessor districts and the first bond issue of the Southeast Arkansas levee district, assert priority based upon the date of issue, except that it is their contention that the second issue of bonds by the Southeast Arkansas levee district was in fact issued under authority of the first act, and the bonds are on a parity with those first issued by that district. The appellees represent the later successive bond issues, and contend that no priorities exist, but that all the issues of bonds have a lien on a parity with the lien of the holders of all bond issues of the several districts.

■ Appellants strongly rely upon the decision of this court in St. Louis Union Trust Co. v. Franklin-American Trust Co., 52 F.(2d) 431, 439, 87 A. L. R. 386, where we had occasion to consider a question of priority among several successive bond issues. In that case we considered four series of bonds, the first issued under authority of two special acts of the Legislature of Arkansas passed in 1911 (Sp. Acts 1911, pp. 260, 1227), the second issued under a special act passed in 1915 (Sp. Acts 1915, p. 297), and the last two issues issued under special acts passed in 1919 and 1921 (Sp. Acts 1919, p. 581; Sp. Acts 1921, p. 495). While there is some similarity between certain of the provisions of those acts and certain of the provisions of Act No. 83 of 1917, yet there are very striking dissimilarities between the situation there presented and that confronting us in the instant case, which we shall now note.

(1) We held that the Supreme Court of Arkansas, in construing the acts there under consideration, had determined that the board could not expend more than the sum of $300,000 to carry out the purpose of the Legislature as expressed in the act. The total cost of the project was definitely determined at the time the original bonds were issued, while in the instant case there is no such limitation nor definite determination. The quoted provisions of Act No. 83 of 1917 show that it became the mandatory duty of the board of the district "to construct, enlarge and maintain levees along the Mississippi and Arkansas rivers in accordance with this Act, and to protect and maintain the same in such effective condition as honest, able and energetic effort on their part may attain." This same board was enjoined to "do all acts in their opinion necessary to secure the district from overflow by the waters of the Mississippi and Arkansas rivers." Section 6, p. 374. Section 2 of the act (page 369), reciting its general purpose and the necessity for the project, broadly states that the board "shall have such powers as are necessary to carry out the scheme of protection sought to be accomplished." The board was authorized to borrow money from time to time as temporary loans, and to issue evidences of indebtedness, bearing interest at 6 per cent. per annum, and it is provided that the board "may also issue interest-bearing certificates for a term not exceeding three years, and bearing a like rate of interest." Section 11, p. 380. At the time of the passing of the original 1917 act, a bond issue not exceeding $1,200,000 was authorized, but there was nothing in the act to indicate that further bond issues might not be authorized, nor that further expenditures might not be required to fulfil the purpose of the act.

(2) In the Franklin-American Trust Company Case the subsequent legislation did not purport to grant equality of all bonds, but it recognized the prior issues and provided that the lien of the subsequent bonds should be "paramount to all other liens except the liens of bonds heretofore issued." This language left but little room for construction because the legislative intent was emblazoned on the face of the statute. In the instant case, it was the legislative intent that the subsequent issues be on an equality with all prior issues, and, as has been observed, the act of 1917, when its purpose be considered, did not fix the amount of the cost of the project, but clearly indicated that the board should proceed to make the project effective, leaving to future developments the question of the necessity for further funds. There was no radical and material change in the plans

involving the construction of the project, and in the instant case the original bondholders did not embark on a limited enterprise, but on an enterprise disclosed by the very acts under which the bonds were issued as being uncertain in the amount of the expenditure, yet carrying an absolute mandate to the authorities to make the project effective.

(3) In the Franklin-American Trust Company Case, no new assessment or provision for tax revenue was made. In that case the original bondholders bought their bonds on the strength of the assessment contained in the statute. If they had been required to share their vested rights in this assessment with subsequent bondholders, without provision made for additional revenue, then, clearly, their contractual rights would have been violated. But it is noted that in the instant case, while there have been successive bond issues, there have been assessed correspondingly increased tax levies; in fact, in the instant case, the increase in the tax levy has been proportionately larger than the increase in the bond issue.

██ (4) The Supreme Court of Arkansas, in Howe v. Long Prairie Levee District, 187 Ark. 725, 62 S.W.(2d) 10, has definitely construed acts, the language of which is almost identical with that which we are now considering, and has held that no priority of rights was intended to be given to any bond issue. It is a general rule that the federal court will follow the construction of a state statute by the court of last resort of that state, even though such decision overrules a previous decision construing a statute and declares void a contract made in reliance on the previous decision. Cleveland & P. R. Co. v. Cleveland, 235 U. S. 50, 35 S. Ct. 21, 59 L. Ed. 127; Moore-Mansfield Construction Co. v. Electrical Installation Co., 234 U. S. 619, 34 S. Ct. 941, 58 L. Ed. 1503; National Mutual Bldg., etc., Ass'n v. Brahan, 193 U. S. 635, 24 S. Ct. 532, 48 L. Ed. 823; Central Land Co. v. Laidley, 159 U. S. 103, 16 S. Ct. 80, 40 L. Ed. 91; Bacon v. Texas, 163 U. S. 207, 16 S. Ct. 1023, 41 L. Ed. 132; Chicago, M., St. P. & P. R. Co. v. Risty, 276 U. S. 567, 48 S. Ct. 396, 72 L. Ed. 703; Cargile v. New York Trust Co. (C. C. A. 8) 67 F.(2d) 585.

It is contended, however, that to deny priority is to permit the impairment of the obligation of a contract, contrary to the provisions of article 1, section 10, of the Federal Constitution. Where the question before the federal court involves the contract clause of the Federal Constitution, then the construction of the statute by the state court is not conclusive on this court. Larson v. State of South Dakota, 278 U. S. 429, 49 S. Ct. 196, 73 L. Ed. 441; Coombes v. Getz, 285 U. S. 434, 52 S. Ct. 435, 436, 76 L. Ed. 866; Appleby v. City of New York, 271 U. S. 364, 46 S. Ct. 569, 70 L. Ed. 992; Moore v. Otis (C. C. A. 8) 275 F. 747; Moore v. Gas Securities Co. (C. C. A. 8) 278 F. 111; First Nat. Bank of Shenandoah v. Liewer (C. C. A. 8) 187 F. 16.

The rule is stated in Coombes v. Getz, supra, as follows: "The decision of the Supreme Court of a state construing and applying its own Constitution and laws generally is binding upon this court; but that is not so where the contract clause of the Federal Constitution is involved. In that case this court will give careful and respectful consideration and all due weight to the adjudication of the state court, but will determine independently thereof whether there be a contract, the obligation of which is within the protection of the contract clause, and whether that obligation has been impaired."

██ If the Supreme Court of Arkansas has correctly construed the statutes in Howe v. Long Prairie Levee District, supra, then the acts authorizing successive bond issues, and placing them on a parity with the original bond issue authorized by the Act of 1917, did not impair the obligations of contract, because the original bondholders contracted with knowledge or constructive notice that subsequent issues might so issue, and, as has been observed, every act authorizing a new issue provided additional taxes to compensate for the added burden.

For the reasons above noted, distinguishing this case from St. Louis Union Trust Company v. Franklin-American Trust Company, we are of the view that no contract rights of holders of bonds under Act No. 83 of 1917 were impaired by the acts authorizing successive issues.

But there are further grounds for sustaining the decree appealed from.

██ It is observed that the act under which the first issue of bonds was authorized by the Southeast Arkansas levee district disclosed on its face the object and purpose of the legislation. The purpose of the successive legislation was the avoidance of the catastrophe of flood, and the reasonableness of the means taken to accomplish that purpose is not questioned. More money was needed, and consequently additional bonds were provided, but to avoid any injury to prior bondholders the Legislature made a proportionately greater

increase in the tax revenue of the district. By this means the inhabitants of the district and their property were protected. There are certain inherent powers in the government to enact laws to protect order, safety, health, and general welfare of society. This power, frequently referred to as the police power, has been said to be as broad as the public welfare. It is an inherent attribute of sovereignty with which the state is endowed for the protection and general welfare of its citizens, and of which the state may not deprive itself. One state Legislature cannot, by any agreement, bind itself or its successors not to exercise this attribute of sovereignty, and all contracts, whether made by the state itself, by its municipalities, or by individuals, are subject to be interfered with or otherwise affected by subsequent statutes enacted in the bona fide exercise of the police power, and such legislative acts are not within the contract clause of the Constitution. Manigault v. Springs, 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274; Griffith v. Connecticut, 218 U. S. 563, 31 S. Ct. 132, 54 L. Ed. 1151; Hudson County Water Co. v. McCarter, 209 U. S. 349, 28 S. Ct. 529, 52 L. Ed. 828, 14 Ann. Cas. 560; West Chicago St. R. Co. v. Illinois ex rel. City of Chicago, 201 U. S. 506, 26 S. Ct. 518, 50 L. Ed. 845; New Orleans Gas-Light Co. v. Louisiana Light & Heat Producing & Mfg. Co., 115 U. S. 650, 6 S. Ct. 252, 29 L. Ed. 516; Texas & N. O. R. Co. v. Miller, 221 U. S. 408, 31 S. Ct. 534, 55 L. Ed. 789; Douglas v. Kentucky, 168 U. S. 488, 18 S. Ct. 199, 42 L. Ed. 553; Stone v. Mississippi, 101 U. S. 814, 25 L. Ed. 1079; New Orleans Gas Light Co. v. Drainage Commission of New Orleans, 197 U. S. 453, 25 S. Ct. 471, 49 L. Ed. 831; Butchers' Union Slaughter House & L. S. L. Co. v. Crescent City Livestock & S. H. Co., 111 U. S. 746, 4 S. Ct. 652, 28 L. Ed. 585; Pennsylvania Hospital v. Philadelphia, 245 U. S. 20, 38 S. Ct. 35, 62 L. Ed. 124; Knoxville Water Co. v. Knoxville, 189 U. S. 434, 23 S. Ct. 531, 47 L. Ed. 887.

■ Were the statutes subsequent to Act No. 83 of 1917 enacted in the exercise of the police power? The Legislature of the state has power to determine primarily what measures are appropriate or needful for the protection of the public morals, public health, or public safety, subject to judicial review. This act (section 2, p. 369) recites that: "The object of this Act is the protection of the people, their land and personal property, railroads, tramroads, telephone, telegraph and electric light and power lines, and all other property from the overflow waters of the Mississippi and Arkansas rivers by a system of levee building. * * *" The subsequent statutes are mere amendments of this act, which did not remove this declaration from the original statute. The declared purpose of the statute is entitled to great weight and respect. Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Dougherty v. United States, 58 App. D. C. 308, 30 F.(2d) 471. But, without such declaration, it seems clear that the legislation is within the police power. The lower court found that the district was engaged from its inception, until the Federal Flood Control Act of 1928 (33 USCA § 702a et seq.), in enlarging, strengthening, and raising the heights of the levees, pursuing the very purpose disclosed by the declaration contained in the act.

The Supreme Court, in Boston Beer Company v. Massachusetts, 97 U. S. 25, 33, 24 L. Ed. 989, said: "Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals."

Having in mind that the property of this district was subject to be overflowed and destroyed by the floods of the Mississippi and Arkansas rivers, it seems clear that the acts of the Legislature attempting to protect this property from the destructive elements by means of maintaining levees and dikes were in the exercise of the police power.

■ Our discussion has referred primarily to the bonds issued under the 1917 act, and acts amendatory thereof, but what has been said with reference to the exercise of the police power at least is equally applicable to the bonds of the predecessor districts.

The taxes provided by the respective acts of the predecessor districts were upon a different basis, and there is nothing in the record to indicate that the margin of security was impaired by the subsequent acts. The bondholders of the predecessor districts received the benefit of taxes upon lands other than those included in their own boundaries, some of which at least were in districts having no bonds. It appears from the record that the dikes and levees of these predecessor districts were small; they were subsequently enlarged and strengthened through the work of the Southeast Arkansas levee district. The lower court found that: "The general plan of levee construction and maintenance dis-

closed by the Act of 1917 and subsequent Acts was for the benefit and protection of all of the land owned by the Southeast Arkansas Levee District and for the benefit and protection of all levees theretofore constructed by said prior smaller districts. The levees provided for by the former districts were inadequate and were insufficient to protect the lands from the overflow waters of the Mississippi and Arkansas Rivers. The entire work contemplated by the 1917 Act, having been undertaken for the benefit of practically all lands within the smaller levee districts, and the construction work done with the funds borrowed by means of subsequent bond issues, having been for the protection of the lands and levees of the former districts, the holders of the subsequent bonds would have the same rights under the laws of Arkansas as the holders of the bonds issued by the prior districts."

The most that can be said with reference to the bondholders of the predecessor districts is that one right has been substituted for another, and the court found that these bondholders were benefited, and they seem to have accepted the benefits provided by the subsequent legislation. $167,000 of these bonds have been paid off, and considerable amounts of outstanding notes and certificates of indebtedness of the predecessor districts have also been paid off by the Southeast Arkansas levee district. The owners of these bonds have acquiesced in the subsequent legislation. They might have demanded ad valorem taxes provided for by the respective acts under which the bonds were issued, but they took no such action, and acquiesced in the benefits conferred by the subsequent legislation for some sixteen years, during which time their bonded indebtedness was greatly reduced through the bonds and tax levies authorized by the subsequent legislation. They had the benefit of additional tax levies; they had the benefit of enlarged and strengthened legislation within their districts; and even in this litigation they are asserting rights under the act of 1917. Having participated in the benefits conferred by this subsequent legislation, and having even in this litigation asserted rights thereunder, the acts should be sustained. Grand Rapids, etc., R. Co. v. Osborn, 193 U. S. 17, 24 S. Ct. 310, 48 L. Ed. 598; Scholey v. Rew, 23 Wall. 331, 23 L. Ed. 99; Deering & Co. v. Peterson, 75 Minn. 118, 77 N. W. 568; Orthwein v. Germania Life Ins. Co., 261 Mo. 650, 170 S. W. 885. One cannot acquiesce in the enactment of a statute and accept benefits thereunder and at the same time be heard to complain that the statute is unconstitutional.

We have carefully considered all other contentions presented by appellants, but are of the view that they are not substantial, and the decree appealed from is therefore affirmed.